German ALFONSO, et al., Plaintiffs,

v.

John T. AUFIERO, et al., Defendants.

No. Civ.A. 97–12252–PBS.

United States District Court,
D. Massachusetts.

Sept. 7, 1999.

Inc., the Somerville Journal, intervenor-plaintiffs.

Peter M. Brown, City of Somerville, Law Department, Somerville, MA, for John T. Aufiero, John J. Bossi, City of Somerville, defendants.

Douglas I. Louison, Merrick and Louison, Boston, MA, for Timothy Doherty, defendant.

Austin M. Joyce, Edward P. Reardon, P.C., Edward P. Reardon, Reardon & Reardon, Worcester, MA, for Christopher Ward, PPA, James Hyde, Patrick Irving, defendants.

Joan E. Langsam, City Solicitor, Law Department, City Hall, Somerville, MA, for Michael Cabral, defendant.

Douglas I. Louison, James W. Simpson, Jr., Merrick & Louison, Boston, MA, for Joseph Blair, defendant.

Jeffrey A. Newman, Newman, Heinlein & Beeler, Boston, MA, for New England Cable News, Inc., interested party.

Joseph Spear, Arlington, MA, interested party pro se.

Kenneth E. Steinfield, Office of the Attorney General, Criminal Bureau, Boston, MA, Bonny M. Gilbert, Assistant Attorney General, Criminal Bureau, Boston, MA, for Lisa McLean, interested party.

### *MEMORANDUM AND ORDER ON ASSESSMENT OF ATTORNEYS' FEES AND COSTS*

SARIS, District Judge.

#### *INTRODUCTION*

After some success in a jury trial in a contentious civil rights action against the City of Somerville, Massachusetts (the "City"), and eight of its police officers, plaintiffs petition for an assessment of attorneys' fees and costs under 42 U.S.C. § 1988 (Docket No. 208). Pursuant to a post-trial settlement agreement among the parties, the City has agreed to pay all attorneys' fees and costs awarded by the Court. Plaintiffs seek $240,961 in fees,

Robert LeRoux Hernandez, Law Offices of Robert L. Hernandez, Malden, MA, for German Alfonso, Christopher Mittell, plaintiffs.

Jonathan M. Albano, Mark W. Batten, Bingham Dana LLP, Boston, MA, for Globe Newspaper Co., intervenor-plaintiff.

Michael T. Gass, Jordana B. Glasgow, Lori B. Silver, Palmer & Dodge, Boston, MA, for Community Newspaper Company,

plus expenses of $50,452.31, for a total of $291,413.31. The City, arguing that plaintiffs' counsel failed to exercise "billing judgment" and that plaintiffs' request is grossly out of proportion to the results actually obtained in the case, challenges numerous aspects of the fee petition and asserts that it owes plaintiffs, at most, only $81,149.66.

After considering the billing records and related materials submitted by the parties, the Court **ORDERS** the City to pay a total of $129,903.38 in fees and $36,757.67 in costs.

## BACKGROUND

The Court briefly summarizes the facts and procedural history leading up to this petition as background for the determination of a reasonable fee award.

This case arose out of a complicated sequence of events beginning in the early morning hours of October 8, 1994, at Night Games, a Somerville nightclub. Plaintiffs German Alfonso and Christopher Mittell, two young Hispanic men, claimed that a group of plain-clothes Somerville police detectives—led by defendant Lieutenant John Bossi and including defendants John T. Aufiero, Christopher Ward, and James Hyde—attacked and beat them without provocation inside Night Games and in the club's parking lot. According to plaintiffs, defendants also beat two other individuals, Michael Henderson and Joseph Spear, at the club. Defendants placed plaintiffs, Henderson and Spear in a police van, where the assaults allegedly continued before the occupants were transported to the Somerville police station.

Once at the station, plaintiffs and Spear were detained together in a holding cell. Henderson, plaintiffs maintained, was beaten in another room. Plaintiffs claimed that defendants, taunting them with racial epithets, again attacked them in their cell. The alleged beatings in the van and at the station apparently occurred in the presence of at least one other police officer, defendant Sargent Michael Cabral, who plaintiffs asserted failed to intervene on their behalf. On the basis of an incident report filed by defendant Aufiero concerning the events at Night Games, defendants charged plaintiffs with the crime of affray. Plaintiffs were ultimately acquitted.

On October 8, 1997, plaintiffs filed suit in this Court under 42 U.S.C. § 1983 against the City and eight individual officers.[1] Their eight-count Second Amended Complaint asserted federal civil rights claims against all defendants for deprivation of the Fourth Amendment rights to be free from unlawful arrest or seizure and from the use of excessive force when being placed under arrest. The complaint also included state law claims against five of the individual defendants under the Massachusetts Civil Rights Act, Mass.Gen.L. ch. 12, § 11I, and under Mass.Gen.L. ch. 93, § 102(a)–(b) (denial of equal rights under the law), as well as claims for false imprisonment, assault and battery, malicious prosecution, and intentional infliction of emotional distress. In addition, plaintiffs alleged a negligence claim against the City under the Massachusetts Tort Claims Act, Mass.Gen.L. ch. 258, § 2. Shortly before trial, this Court permitted plaintiffs to add a claim against four of the officers under 42 U.S.C. § 1985(3) for race-based conspiracy to deprive plaintiffs of equal protection of the laws.

On June 1, 1998, defendants made an offer of judgment pursuant to Fed.R.Civ.P. 68, proposing that the Court enter judgment against the City on the § 1983 municipal liability claim in the total amount of $35,000 and dismiss all of the other claims against the City and the individual defendants. The $35,000 figure included all expenses and attorneys' fees incurred by plaintiffs through June 1, 1998, the date of the offer. Plaintiffs did not respond to this offer.

---

1. The original complaint named five officers as defendants; this Court later allowed plaintiffs to amend their complaint to include three more individuals.

Before trial, the Court bifurcated and reserved the claims against the City to a second phase of the trial before the same jury, depending on the verdict against the individual officers. On January 11, 1999, plaintiffs proceeded to a jury trial against the individual officers. At the close of their case, plaintiffs voluntarily dismissed their claims against three of the officers: Timothy Doherty, Patrick Irving, and Joseph Blair. At the end of the trial, which lasted twelve days, the Court charged the jury on the § 1983, § 1985(3), malicious prosecution, and intentional infliction of emotional distress claims.

After seven days of deliberations, the jury returned a verdict against two of the officers. It found that defendants Hyde and Bossi had intentionally inflicted emotional distress upon Mittell and that Hyde had used excessive force against him in the police van outside Night Games. The jury also found that Hyde and Bossi had intentionally inflicted emotional distress upon Alfonso and that Bossi had used excessive force against him in the holding cell. It awarded $4425 in compensatory damages to Mittell for intentional infliction of emotional distress, $3751 in compensatory damages to Alfonso for the same, and $3750 in punitive damages to each plaintiff on the excessive force claims, for a total verdict of $15,676 ($8175 to Mittell and $7501 to Alfonso). Although marked by some degree of jury confusion,[2] the verdict reflects a finding that plaintiffs' civil rights were violated by Hyde and Bossi but that the violations in and of themselves did not cause plaintiffs any compensatory damages. The print media, having intently followed the case throughout, reported the result largely as a victory for the defen-

dants. *See* Patricia Nealon, *Jury Rejects Most Claims in Somerville Beating Case,* Boston Globe, Feb. 9, 1999, at B1; Ralph Ranalli, *Jury Finds Little Wrong Done by Cops in Brawl,* Boston Herald, Feb. 9, 1999. New England Cable News, which assigned an investigative reporter to the story, gave a more positive spin on the outcome from plaintiffs' vantage point.

The parties' wrangling continued after trial. In a series of increasingly hostile letters, they disputed whether they had reached a binding settlement agreement in the hour or so after hearing the jury's verdict, and just before commencing the second phase of the trial on municipal liability. Plaintiffs also moved for a new trial. On March 12, 1999, at a conference before this Court, the parties signed a settlement agreement requiring defendants Hyde and Bossi personally to pay the amount of the punitive damages awarded by the jury and providing that the City would pay the remainder of the damages awarded, with prejudgment interest, as well as all attorneys' fees and costs as determined by this Court. Plaintiffs released all other claims, and both sides waived their appellate rights on all issues except attorneys' fees, costs, and the effect of defendants' Rule 68 offer of judgment on the assessment of fees and costs. Pursuant to the terms of the agreement, the Court entered a settlement order of dismissal on March 15, 1999.

Plaintiffs filed this fee petition on March 31, 1999. In support, plaintiffs have submitted an accounting of legal services amounting to 1030.1 hours in attorney time and reflecting a balance of $238,961. (Pls.' Pet. Ex. E.) These figures do not include

---

**2.** Specifically, in the final hours of deliberations, after the jury returned an inconsistent verdict, the jury changed its findings on the emotional distress claims against defendant Hyde and shifted some of the punitive damages it awarded for the emotional distress claims in response to the Court's instruction that the jury could not award punitive damages in the absence of a civil rights violation. In addition to these efforts to achieve internal consistency across the lengthy (105–question) special verdict form, the jury ultimately failed to award plaintiffs the requisite nominal damages for the civil rights violations. Importantly for purposes of this fee petition, however, the jury did not at any point find that the civil rights violations caused compensatory damages or that any but these two defendants (Hyde and Bossi) were liable for any but the excessive force and emotional distress claims.

time that plaintiffs' counsel, Attorney Robert L. Hernandez, anticipated spending to defend the petition (eight hours, valued at $2000) and that he consequently added to the total fees requested (for a total of $240,961). The figures do include, however, fees incurred after the June 1, 1998, offer of judgment. According to the computer-generated invoice, which contains over 1000 entries listing the billers' initials, dates, hours spent, hourly rates, and amounts charged, Attorney Hernandez logged 875.4 hours on the case and charged $250 per hour, his usual rate, for his time. His associate, Attorney Carmen Paniagua, and another lawyer, Attorney Martin Flax, logged 154.7 hours, which were billed at $130 per hour. The invoice entries also describe, in varying degrees of detail, the services rendered by each attorney.[3]

In addition to the invoice, plaintiffs filed an itemized list of case-related expenses showing a balance of $50,372.31. (Pls.' Pet. Ex. J.) Again, the list does not include anticipated expenses associated with the fee petition, which Attorney Hernandez estimated at $80 and added to the total costs requested (for a total of $50,452.31), but it does include expenses incurred after the June 1, 1998, settlement offer. Among other things, plaintiffs have also appended affidavits from other local civil rights attorneys regarding fees in similar cases, as well as a study documenting the biases faced by minority litigants, to support their request.

The City has responded with an equally thick brief in opposition. Attached to the brief are highlighted copies of Attorney Hernandez's billing records indicating some of the disputed entries, as well as several tables categorizing other entries and summarizing the City's many objections to the petition. In addition, the City has offered affidavits from two Boston-area attorneys to challenge the reasonableness of Attorney Hernandez's hourly rate.

## DISCUSSION

Under 42 U.S.C. § 1988, this Court has the discretion to "allow the prevailing party [in a civil rights action] ... a reasonable attorney's fee as part of the costs" to which that party is normally entitled under Fed.R.Civ.P. 54(d). 42 U.S.C. § 1988(b). The parties agree that plaintiffs satisfy the relatively low threshold required to qualify for "prevailing party" status. *See, e.g., Farrar v. Hobby,* 506 U.S. 103, 109, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992); *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.,* 489 U.S. 782, 789, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989); *Williams v. Hanover Hous. Auth.,* 113 F.3d 1294, 1299 (1st Cir.1997).

"However, the fact that [plaintiffs] were the prevailing parties does not mean that they can recover for all the time spent in this litigation." *Culebras Enters. Corp. v. Rivera–Rios,* 846 F.2d 94, 102 (1st Cir.1988). Instead, the Court calculates a reasonable fee award using the lodestar method, which is "the strongly preferred method by which district courts should determine what fees to award prevailing parties" under § 1988. *Coutin v. Young & Rubicam P.R., Inc.,* 124 F.3d 331, 337 (1st Cir.1997) (citing *Lipsett v. Blanco,* 975 F.2d 934, 937 (1st Cir.1992)). To arrive at a reasonable award, the Court "must evaluate the data submitted by the fee-seeker, compute a lodestar, consider the totality of the adjustment factors approved by Congress and the [Supreme] Court, and make specific, reasoned adjustments" to reduce the award if appropriate. *Id.* at 340 (citation omitted).

Although this Court is not required to produce a "painstaking" explanation of its decision, which is reviewed "deferentially, according substantial respect to the

---

**3.** In their reply brief to the City's opposition to the fee petition, plaintiffs attempt, for some of the billing entries, to provide more detailed descriptions of the work performed. (Pls.' Reply Ex. 1.)

trial court's informed discretion," *id.* at 336–37 (citing *Brewster v. Dukakis,* 3 F.3d 488, 492 (1st Cir.1993)), recent case law demonstrates that the First Circuit examines these "discretionary" decisions extremely closely, *see, e.g., McMillan v. Massachusetts Soc'y for the Prevention of Cruelty to Animals,* 140 F.3d 288, 310–11 (1st Cir.1998), *cert. denied,* — U.S. —, 119 S.Ct. 870, 142 L.Ed.2d 772 (1999); *Rodriguez–Hernandez v. Miranda–Velez,* 132 F.3d 848, 858–60 (1st Cir.1998); *Williams,* 113 F.3d at 1297–98. The First Circuit has " 'never required that [district] courts set forth hour-by-hour analyses of fee requests.' " *United States v. Metropolitan Dist. Comm'n,* 847 F.2d 12, 16 (1st Cir.1988) (alteration in original) (quoting *Jacobs v. Mancuso,* 825 F.2d 559, 562 (1st Cir.1987)). "[A]t a bare minimum," however, the trial court's fee determination "must expose [its] thought process and show the method and manner underlying its decisional calculus," *Coutin,* 124 F.3d at 337 (citing cases), "especially . . . when the fee award departs substantially from the contours shaped by the application," *id.*

### I. Calculating the Lodestar

■ The lodestar approach "contemplates judicial ascertainment of 'the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate' as the starting point in constructing a fee award." *Id.* (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). Though the prevailing party is under an obligation to submit a request for fees that includes its calculations of hours expended multiplied by a requested hourly rate, the Court "has a right—indeed, a duty—'to see whether counsel substantially exceeded the bounds of reasonable effort.' " *Metropolitan Dist. Comm'n,* 847 F.2d at 17 (quoting *Pilkington v. Bevilacqua,* 632 F.2d 922, 925 (1st Cir.1980)). "[T]he [attorney's] bill need not be swallowed whole by the client's litigation adversary just because it is the

[attorney's] bill." *Id.* The Court, then, must engage in a thoughtful analysis of the number of hours expended and the hourly rates charged to ensure that both are reasonable. In this way, the trial court, "though adhering to the time-and-rate-based method of fee calculation, may fashion a lodestar which differs substantially from the fee requested by the prevailing party." *Coutin,* 124 F.3d at 337.

Here, the Court sets out the standard it applied to Attorney Hernandez's billing records in arriving at reasonable hours figures. Then, after explaining the standard applied for hourly rates, the Court applies both standards to Attorney Hernandez and his co-counsel to arrive at the lodestar.

### A. Reasonable Hours Expended

■ "Typically, a court proceeds to compute the lodestar amount by ascertaining the time counsel actually spent on the case 'and then subtract[ing] from that figure hours which were duplicative, unproductive, excessive, or otherwise unnecessary.' " *Lipsett,* 975 F.2d at 937 (alteration in original) (quoting *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 950 (1st Cir.1984)); *see also Coutin,* 124 F.3d at 337. In doing so, "the presiding judge must 'draw[ ] on [her] own experience and wisdom [in] deciding whether the time spent on each phase was in excess of a reasonable amount.' " *Metropolitan Dist. Comm'n,* 847 F.2d at 18 (first and third alterations in original) (quoting *Gabriele v. Southworth,* 712 F.2d 1505, 1507 (1st Cir.1983)).

In combing through the billing records, the Court encountered a number of entries containing reference to two different tasks with no indication of how much time was spent on each. Whenever such an entry involved one of the enumerated uncompensable categories discussed in this section, I allocated fifty percent of the hours in that entry to the category in question.[4]

---

4. For example, on September 28, 1998, Attor-     ney Hernandez billed .40 hours for the follow-

### 1. *Unproductive or Unnecessary Hours*

■ Citing a failure by plaintiffs' counsel to exercise "billing judgment," the City challenges a long list of Attorney Hernandez's time entries as unproductive or otherwise unnecessary to advance the litigation. The Court agrees with the City on a number of these entries. Hours spent by plaintiffs' counsel talking with the press (7.2) were eliminated. *See, e.g., Rum Creek Coal Sales, Inc., v. Caperton*, 31 F.3d 169, 176 (4th Cir.1994) ("The legitimate goals of litigation are almost always attained in the courtroom, not in the media."); *Knight v. Alabama*, 824 F.Supp. 1022, 1033 (N.D.Ala.1993) (holding that "time spent talking with the media is not compensable because it is not 'ordinarily necessary to secure the final result obtained from the litigation' " (quoting *Pennsylvania v. Delaware Valley Citizens' Council*, 478 U.S. 546, 561, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1985))); *cf. Hart v. Bourque*, 798 F.2d 519, 523 (1st Cir.1986) (disallowing time spent on " 'arrangements for lectures or publications about the case' ").

■ The Court also disallowed time spent communicating with the Attorney General's office (.90 hours), as there is little indication that those communications were necessary to the presentation of this case.

■ In addition, the Court eliminated the considerable time (62.6 hours) that Attorney Hernandez spent waiting in the courthouse for the jury's verdict before the jury returned it late in the day on February 8, 1999. Counsel were free to leave and/or work on matters for other clients during that time.

■ The Court also deducted the 6.7 hours that plaintiffs' counsel unsuccessfully spent on mediation in September 1998. The Court eliminated one hour that Attorney Hernandez spent in January 1998 on a premature motion for costs associated with service of process. I also subtracted the 11.6 hours spent on plaintiffs' motion for a new trial (referred to in the fee petition as a motion for judgment notwithstanding the verdict), which was rendered moot by the parties' subsequent settlement agreement.

■ Finally, the Court deducted fifty percent of the considerable time (99.8 hours total) spent reviewing or editing the videotape depositions (of Henderson, Spear, and five of the defendants), four of which were played at trial.[5] Plaintiffs' attorneys were creative in editing the tapes of the individual police officers to highlight inconsistencies in their testimony. Although this juxtaposition was a helpful teaching tool, the editing process was excessively time-consuming and costly. Because the costs of production outweighed the benefits, I reduced by half the allowable fees and costs.

■ The Court allowed, however, the time spent on plaintiffs' motion for leave to file a second amended complaint adding the § 1985(3) claim to the case. I also allowed the hours spent preparing plaintiffs' opposition to defendants' motion for a protective order and temporary restraining order concerning the public release of certain deposition transcripts. Plaintiffs' opposition was not duplicative of the oppositions filed by representatives of the media; rather, plaintiffs presented a valid First Amendment claim on their own behalf.

■ The Court did not reduce as unreasonable in themselves the very long

---

ing: "Case preparations and / Prep for Mediation—/ Telephone call from Mr. / David Prum—spoke." (Pls.' Pet.Ex. E at 37.) I therefore allocated .20 hours to preparation for mediation and .20 hours to the phone call.

5. Three of the videotape depositions—of Doherty, Spear, and Henderson—were not even used at trial. However, because the billing records do not indicate how much of the time spent reviewing and editing videos is allocable to these three individuals, I simply reduced all video time by fifty percent.

hours that Attorney Hernandez billed on each of three single days (December 20, 1998; December 21, 1998; and January 12, 1999), because Attorney Hernandez was working on the case largely by himself and trial was approaching or had begun at the time.

## 2. *Imprecision*

■ As First Circuit law permits me to do, I eliminated a significant number of hours for which Attorney Hernandez's records are "not sufficiently precise" as to the tasks accomplished or the claim pursued to allow the Court to assess whether the time spent was reasonable. *Deary v. City of Gloucester*, 9 F.3d 191, 197–98 (1st Cir. 1993) (instructing that, in the absence of "specific information about . . . the nature of the work performed," the requested fees "should be reduced or even denied altogether" (citing *Calhoun v. Acme Cleveland Corp.*, 801 F.2d 558, 560 (1st Cir.1986), and *Grendel's Den*, 749 F.2d at 952)); *see also Tennessee Gas Pipeline Co. v. 104 Acres of Land*, 32 F.3d 632, 634 (1st Cir.1994) (requiring " 'a full and specific accounting of the tasks performed' " and upholding a thirty-percent reduction in the fee award for over-general time sheets (quoting *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 527 (1st Cir.1991))); *Lipsett*, 975 F.2d at 938; *Nadeau v. Helgemoe*, 581 F.2d 275, 279 (1st Cir.1978) (suggesting that "counsel's records . . . [should] provide a proper basis for determining how much time was spent on particular claims"). The entries in question, totaling 115.4 hours in all, contain only vague descriptions such as "Drafting documents," "Reviewing documents," "Case planning," or "Trial planning/Trial preparations." These descriptions simply do not fit the bill, *see Tennessee Gas*, 32 F.3d at 634 (approving the reduction of fees for similar entries), especially in a complex, multi-claim case.

## 3. *Unsuccessful Claims*

■ With one exception, the Court did not deduct specific hours spent on claims that were ultimately unsuccessful. *See, e.g., McMillan*, 140 F.3d at 311 (permitting courts to make such deductions in certain circumstances); *Coutin*, 124 F.3d at 337 (same) (citing *Hensley*, 461 U.S. at 435, 103 S.Ct. 1933). It declined to do so for three principal reasons. First, "attempts to allocate hours between claims may be unwarranted where an action involves related legal theories applied to a common core of facts." *Phetosomphone v. Allison Reed Group, Inc.*, 984 F.2d 4, 7 (1st Cir.1993) (citing *Hensley*, 461 U.S. at 434–35, 103 S.Ct. 1933); *cf., e.g., McMillan*, 140 F.3d at 311. Second, the Court should not attempt to parse out work on unsuccessful claims hour-by-hour " '[w]here it would be an exercise in futility.' " *Lipsett*, 975 F.2d at 940–41 (alteration in original) (quoting *General Dynamics Corp. v. Horrigan*, 848 F.2d 321, 325 (1st Cir.1988)). Third, because the Court may consider less-than-complete success as a factor in adjusting the lodestar, *see, e.g., Coutin*, 124 F.3d at 339–40, extraction of "unsuccessful" hours when calculating the lodestar would run the risk of doubly reducing the award, *see Phetosomphone*, 984 F.2d at 8.

■ The one exception is that the Court eliminated, to the extent it was discernible, much of the time spent working on the malicious prosecution claim on the ground that the claim was tangentially related to the successful claims in the case. "Attorneys' fees normally should not be awarded for time spent in litigating (or preparing to litigate) unsuccessful, severable claims." *Coutin*, 124 F.3d at 339 (citing *Hensley*, 461 U.S. at 435, 103 S.Ct. 1933, and *Lipsett*, 975 F.2d at 940); *see also, e.g., Koster v. Trans World Airlines, Inc.*, 181 F.3d 24, 38 (1st Cir.1999). Claims are severable when they "rest on different facts and legal theories." *Coutin*, 124 F.3d at 339; *see also, e.g., Koster*, 181 F.3d at 38.

The malicious prosecution claim stemmed from a distinct set of events that

occurred after the incidents at Night Games and in the holding cell—namely, defendant Aufiero's compilation of the incident report, defendants' decision to charge plaintiffs with affray, and the resulting criminal trials. *See Goodwin v. Metts,* 973 F.2d 378, 382–83 (4th Cir.1992) (holding that civil rights plaintiffs' malicious prosecution claims were unrelated to their other claims); *Lenard v. Argento,* 808 F.2d 1242, 1246–47 (7th Cir.1987) (finding plaintiff's malicious prosecution claim temporally and conceptually distinct from his excessive force claim). It is not true that, "in order to try [their] successful claims, [plaintiffs] would have had to try the entire case, including evidence relevant to the unsuccessful [malicious prosecution] claim[ ]." *Krewson v. Finn,* 107 F.3d 84, 85 (1st Cir.1997).

Although Attorney Hernandez's billing records do not indicate when he worked specifically on the malicious prosecution claim, there are, as the City points out, three clusters of activities that clearly relate to that claim: matters concerning Lisa McLean, the Assistant District Attorney who prosecuted plaintiffs' criminal cases; matters concerning Spear, who witnessed events relevant to all claims in the case; and matters concerning Thomas Macone, a Somerville police officer who allegedly offered to dismiss the criminal charges against Henderson in return for Henderson dropping his criminal complaints against several of the defendants. The Court eliminated identifiable hours spent on McLean and Macone (6.4), including an estimated one-half hour spent on McLean's testimony at trial. For the most part, the Court allowed the time spent on matters concerning Joseph Spear, whose testimony pertained to the incidents of October 8, 1994, as well as to the malicious prosecution claim. However, I deducted 9.6 hours associated with plaintiffs' motion to compel, contempt motion, and third de-

position of Spear, all of which pertained only to Spear's identification of Macone.

### 4. Anticipated Fees for Defending Fee Petition

■ The City does not specifically challenge the fees that Attorney Hernandez requested for an anticipated eight hours of work defending this petition (although the City did not include this time in its own calculation of fees owed).[6] To date, plaintiffs' defense of the fee petition consists of a fifteen-page reply (plus three additional exhibits, including a more detailed billing record for some entries) to the City's opposition to the petition. Based on the number of hours Attorney Hernandez worked to prepare the petition in the first place (over thirty), I concluded that his estimate of eight hours to defend the petition was reasonable, and I allowed those hours.

### B. Reasonable Hourly Rates

The second part of the calculation of the lodestar is the setting of an hourly rate for each attorney. However, in accordance with approved First Circuit practice, I found it appropriate to assign "different rates to [the] different tasks" composing the reasonable hours figure. *Metropolitan Dist. Comm'n,* 847 F.2d at 19–20 (citing *Jacobs,* 825 F.2d at 561 n. 3); *see also, e.g., Brewster,* 3 F.3d at 492 & n. 4; *McLaughlin v. Boston Sch. Comm.,* 976 F.Supp. 53, 62 (D.Mass.1997) ("[I]t is well-settled that different hourly rates are appropriate when the same attorney performs different kinds of work."); *cf. McMillan,* 140 F.3d at 307–08; *Lipsett,* 975 F.2d at 937, 939–40 (directing courts to apply "hourly rates to the constituent tasks"). Therefore, I first applied a distinction between "core" legal work and "non-core" legal work.

---

6. In fairness, Attorney Hernandez has not itemized this time. However, requiring additional paperwork on such a small portion of the overall bill seems pointless and will entail incurring more attorneys' fees. If the City wants to press a challenge on these eight hours, it should move for reconsideration.

### 1. *Core vs. Non-Core Work*

■■■■■ Under the First Circuit's taxonomy, core legal work "includes legal research, writing of legal documents, court appearances, negotiations with opposing counsel, monitoring, and implementation of court orders." *Brewster,* 3 F.3d at 492 n. 4. Non-core work, on the other hand, "consists of less demanding tasks, including letter writing and telephone conversations." *Id.* "In addition, non-core services also include attendance at court hearings in a non-participatory capacity and conferences with co-counsel." *McLaughlin,* 976 F.Supp. at 62 (citing cases).

■■■■ During its record review, the Court designated as core the time spent performing specified legal research, drafting and editing legal documents for submission to the Court and defendants, reviewing legal submissions of opposing parties, appearing in court and preparing for hearings and trial, preparing for and taking depositions, and performing other tasks involving independent legal thought. This time included hours spent meeting with plaintiffs in the days immediately preceding the trial.

■■■■ The Court designated as non-core, however, all entries for writing and reviewing correspondence and for telephone calls (including calls to opposing counsel). Regarding the telephone calls, the City argues that Attorney Hernandez unreasonably billed .10 of an hour ($25) for calls that no one answered or that consisted simply of Attorney Hernandez leaving or checking a message, and asks the Court first to reduce the fee charged for each such call by eighty-six percent to reflect more realistically the actual time spent (arguably, no more than one minute per call). Because of the difficulty of dissecting every unsuccessful call, however, I simply deleted the time spent on calls that the billing records explicitly indicated were unanswered or involved only a message, and I applied the non-core rate uniformly to all completed telephone calls that I allowed as part of the reasonable hours figure.

The Court also designated as non-core all entries for conferences or consultations with third parties, for meetings with plaintiffs other than those preparing for their depositions or immediately before trial, for a meeting with co-counsel after the trial, for responding to discovery requests, for issuing subpoenas and noticing depositions, for writing memos to the file, for scheduling, and for travel. In addition, I treated as non-core the time spent performing various tasks that the billing records list under the general heading "File Review." None of the specified tasks, such as reviewing the file for missing documents or arranging to pick up documents from the City, involves a skill level commensurate with that required for core work.

■■■■ Normally, time spent preparing fee petitions is also considered non-core because it involves "little more than 'documenting what a lawyer did and why he or she did it.' " *Brewster,* 3 F.3d at 494 (quoting *Gabriele,* 712 F.2d at 1507). As the petition raises only one significant legal issue (involving Fed.R.Civ.P. 68), the Court designated ninety percent of the hours spent preparing and defending it as non-core. The remaining ten percent was treated as core.

■■■■ The Court also agreed with the City that hours spent by plaintiffs' counsel filing documents with the Court or on the computer and taking photographs to the lab for processing should not be compensated at their usual hourly rates. "[C]lerical or secretarial tasks ought not to be billed at lawyers' rates, even if a lawyer performs them." *Lipsett,* 975 F.2d at 940 (finding that hours involving merely translation of documents and court filings should be compensated at a rate "less extravagant" than $150 per hour (citing cases)); *see also McMillan,* 140 F.3d at 307–08 (finding an abuse of discretion where the trial court did not distinguish between tasks that "could have been ade-

quately performed by a less-experienced lawyer or by a secretary or paralegal"). Accordingly, although recognizing Attorney Hernandez's status as a sole practitioner operating without the support of a large clerical or legal staff, the Court determined that the time spent for photo processing and computer filing should have been billed at $40 per hour. *See Guckenberger v. Boston Univ.,* 8 F.Supp.2d 91, 107 (D.Mass.1998) (applying a rate of $40 per hour for non-core paralegal work in the Boston area).

Finally, in applying these distinctions, the Court faced the difficulty of a number of mixed entries containing core, non-core, and clerical tasks with a single time figure.[7] Consistent with its past practice, the Court decided to divide the hours in all such mixed entries equally between the component categories. *See id.* at 102 (considering mixed entries as one-half core, one-half non-core). The one exception was for travel time. When an entry explicitly contained a reference to travel time without indicating how many hours were actually spent traveling, I allocated one hour of the entry for travel. Some entries for attending court hearings or the trial made no mention of travel time. Presuming that it was included, I allocated one hour of each of these entries for travel as well.[8]

In keeping with the approved First Circuit standard, the Court applied rates for non-core hours at two-thirds the approved billing rates it assigned for core legal work. *See Brewster,* 3 F.3d at 492; *McLaughlin,* 976 F.Supp. at 62.

### 2. *Hourly Rates for Each Attorney*

In order to determine the appropriate hourly rates for core work performed by Attorney Hernandez, Attorney Paniagua, and Attorney Flax, the Court

looked to the rates " 'prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.' " *Grendel's Den,* 749 F.2d at 955 (quoting *Blum v. Stenson,* 465 U.S. 886, 895 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)); *see also, e.g., Lipsett,* 975 F.2d at 937 (applying the " 'prevailing rates in the community for comparably qualified attorneys' " (quoting *Metropolitan Dist. Comm'n,* 847 F.2d at 19)). The relevant community for purposes of this determination is Boston, "[t]he community in which the court sits," *National Wildlife Fed'n v. Hanson,* 859 F.2d 313, 317 (4th Cir.1988); *see also, e.g., Guckenberger,* 8 F.Supp.2d at 103 (noting the "presumption that local Boston rates apply" to a case heard in federal district court in Boston (citing cases)).

### a. *Attorney Hernandez*

This Court recently found that $250 per hour is the typical rate for senior private civil rights trial attorneys in Boston. *See id.* at 105. Given Attorney Hernandez's nearly twenty years of private practice, much of which has centered on civil rights litigation and police misconduct cases in particular, this rate is fully justified for the core work.

### b. *Attorneys Paniagua and Flax*

The City does not specifically challenge the hourly rate of $130 for work performed by Attorney Hernandez's co-counsel. In any event, based on a review of the credentials and experience levels of these attorneys, both of whom had substantial litigation experience at the time of this case, I concluded that this rate is also appropriate. *See id.* at 108 (awarding an hourly rate of $140 to a junior attorney with three years of experience).

---

7. For example, on May 4, 1998, Attorney Hernandez billed .30 hours for the following: "Telephone call with / Telephone call from City of / Somerville—spoke / Reviewing documents Filing / documentation [onto the computer]." (Pls.' Pet.Ex. E at 17.)

8. If this presumption is incorrect, plaintiffs should move for reconsideration with an affidavit documenting the amount of travel time at non-core rates.

## C. *Lodestar*

In sum, Attorney Hernandez billed 883.4 hours (including estimated time for defending this fee petition) as the primary attorney on the case. After review of the records, the Court determined that Hernandez reasonably spent 628.8 hours on the case, 424.6 of which involved core legal work, 201 of which involved non-core legal work, and 3.2 of which involved work of a clerical nature. As indicated, his core time will be compensated at a rate of $250 per hour, and his non-core time will be compensated at a rate of $165 per hour. Time spent performing clerical tasks will be compensated at $40 per hour. Together, Attorney Paniagua and Attorney Flax billed 154.7 hours. After review, the Court determined that these lawyers reasonably performed 63.9 hours of core legal work, 58.7 hours of non-core legal work, and 2.2 hours of clerical-type work. Their core time will be compensated at a rate of $130 per hour, and their non-core time will be compensated at a rate of $85 per hour.

The lodestar that results from the above figures is $152,827.50. The Court's rate-and-hour determinations and resulting calculations are set forth as a table in Appendix A.

## II. *Adjustment of the Lodestar*

■ "Once established, the lodestar represents a presumptively reasonable fee, although it is subject to upward or downward adjustment in certain circumstances." *Lipsett*, 975 F.2d at 937 (citing *Blum*, 465 U.S. at 897, 104 S.Ct. 1541). The Court may exercise its "authority to adjust the lodestar" only "in accordance with accepted principles." *Coutin*, 124 F.3d at 337 (citing *Hensley*, 461 U.S. at 429–31, 103 S.Ct. 1933). As the City points out, a "preeminent consideration in the fee-adjustment process" is the "results obtained" by the plaintiffs. *Id.* at 338 (citing *Hensley*, 461 U.S. at 432, 440, 103 S.Ct. 1933); *see also, e.g., Rodriguez–Hernandez*, 132 F.3d at 859 ("In a civil rights lawsuit, '[t]he result is what matters'...."

(alteration in original) (quoting *Hensley*, 461 U.S. at 435, 103 S.Ct. 1933)).

■ In adjusting the lodestar for the results obtained, a court " 'may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success.' " *Andrade v. Jamestown Hous. Auth.*, 82 F.3d 1179, 1191 (1st Cir.1996) (quoting *Hensley*, 461 U.S. at 436, 103 S.Ct. 1933). The guiding principle, nonetheless, is that a court "should award only that amount of fees that is reasonable in relation to the results obtained" at trial. *Id.* (citing *Hensley*, 461 U.S. at 435, 438–4, 103 S.Ct. 1933); *see also, e.g., id.* ("*Hensley* makes clear that where multiple claims are interrelated and a plaintiff has achieved only limited success, awarding her the entire lodestar amount would ordinarily be excessive." (citing *Hensley*, 461 U.S. at 436, 103 S.Ct. 1933)).

■ The First Circuit considers, in combination, three "meanings" of the term "results obtained": "a plaintiff's success claim by claim," "the relief actually achieved," and "the societal importance of the right which has been vindicated." *Coutin*, 124 F.3d at 338. The Court briefly discusses each meaning and then applies them, together, to this case.

### A. *Claim–by–Claim Success*

■ This approach focuses on the number of substantive causes of action on which a plaintiff prevailed. *See id.* at 340. "If a plaintiff prevails on only some of multiple claims, then a fee reduction may be in order." *Id.* at 339. In contrast, when plaintiffs have "prevailed up and down the line" on their claims, "a claims-based, results-obtained fee reduction is wholly inappropriate." *Id.* at 340; *see also Rodriguez–Hernandez*, 132 F.3d at 859 (citing *Coutin*). In making this determination, the trial court considers all of the related claims—that is, claims based "on a common core of facts and on related legal theories"—both successful and unsuccess-

ful. *Id.* (citing *Hensley,* 461 U.S. at 435, 103 S.Ct. 1933); *see also Coutin,* 124 F.3d at 339 (outlining an approach that first weeds out unsuccessful, unrelated claims as not compensable and then proceeds to analyze the degree of success on the interrelated claims).

#### B. *Relief Actually Achieved*

■ The second meaning of "results obtained" focuses on the damages awarded to the plaintiff. *See id.* at 340. The trial court has the "discretion to reduce a fee award in response to limited relief even in the presence of complete claims-based success." *Id.* (citing *Cartwright v. Stamper,* 7 F.3d 106, 109–10 (7th Cir.1993)). However, a plaintiff "should receive significant fees when he has won a *partial* victory on a civil rights claim while receiving substantially the relief he there sought...." *Aubin v. Fudala,* 782 F.2d 287, 291 (1st Cir. 1986); *cf. Hensley,* 461 U.S. at 440, 103 S.Ct. 1933 ("Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised."); *Coutin,* 124 F.3d at 339 ("[A] plaintiff who has limited success from a claim-by-claim standpoint, but who nevertheless obtains substantial compensation or other important relief, usually will fare much better in the fee wars, even though some of her claims failed." (citing *Hensley,* 461 U.S. at 440, 103 S.Ct. 1933)). In addition, the size of any discrepancy between "the damages requested in the complaint and the damages awarded," though relevant, does not "amount to more than one element in the constellation of factors that the court considers when determining the quality of the results obtained." *Id.* at 338.

#### C. *Societal Importance of the Right Vindicated*

■ The third meaning attached to the term "results obtained" refers more broadly to the impact of the case on others

similarly situated. Attorneys' fees should be awarded in a way consistent with "the recognized principle that even small damage awards may mean a substantial victory for 'a policy that Congress considered of the highest importance.' " *Lewis v. Kendrick,* 944 F.2d 949, 955 (1st Cir.1991) (quoting *City of Riverside v. Rivera,* 477 U.S. 561, 575, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986)). A substantial attorneys' fee award may be maintained, even in the case of limited or nominal damages, based on "the importance of providing an incentive to attorneys to represent litigants ... who seek to vindicate constitutional rights but whose claim may not result in substantial monetary compensation" and on "the deterrent impact" of litigation. *O'Connor v. Huard,* 117 F.3d 12, 18 (1st Cir.1997), *cert. denied,* 522 U.S. 1047, 118 S.Ct. 691, 139 L.Ed.2d 636 (1998).

#### D. *The Bottom Line*

■ Based on its application of the three meanings of "results obtained," *see Coutin,* 124 F.3d at 338, the Court concludes that the failure of plaintiffs to succeed on all of their claims and to obtain all of their requested relief supports a reduction of the lodestar by fifteen percent.

Plaintiffs prevailed against two key defendants (Hyde and Bossi) on one of the two § 1983 civil rights claims (excessive force) that constituted the factual and legal heart of their case. Given that the injuries they alleged were primarily psychological in nature, their success on the claim for punitive damages is significant. The City incorrectly argues that, under 42 U.S.C. § 1988, plaintiffs should not recover the fees or costs associated with the successful pendent state law claim of intention infliction of emotional distress, which is closely related to the excessive force claim. *See, e.g., id.* at 342 (noting that a prevailing civil rights plaintiff is entitled to fees for hours spent on related state law claims, even when he receives a substantial portion of the damages sought therefrom (citing *Aubin,* 782 F.2d at 291)); *cf. Pheto-*

*somphone*, 984 F.2d at 7 (holding that a court is "entitled to eliminate or discount hours or other expenses that it [finds] would not have been incurred but for the unsuccessful state-law claim").

However, plaintiffs lost their unlawful arrest and race-based conspiracy claims, the latter of which addressed what plaintiffs clearly considered an extremely important component of their injury (though in fairness to plaintiffs, it required very little additional briefing or evidentiary time to establish). Moreover, plaintiffs did not succeed on their claims against the majority of the defendants, including Ward and Aufiero, the other key players in the allegations. A number of these claims simply lacked much evidentiary foundation, as plaintiffs themselves ultimately recognized when they agreed to dismiss three of the minor defendants before the case went to the jury.

The damages award ($15,676) was not in itself insubstantial. Based on the evidence presented at trial, each plaintiff received more than enough to compensate him for any medical expenses resulting from the use of excessive force, as well as the legal expenses associated with defending the charges of affray. *Cf. Coutin*, 124 F.3d at 340 (finding an award of over $45,000 substantial, especially in view of the fact that it represented three times the plaintiff's yearly salary). Plaintiffs are college-educated, successful professionals who come from good family backgrounds. One has no criminal history, the other a minimal one. They have moved on with their lives since the incident in this case—one of them even appeared as an extra in a recent Hollywood film. Similarly, defendant police officers (particularly Hyde) have impressive backgrounds and have won various awards for valor in police work. Accordingly, the modest amount of compensatory and punitive damages is not surprising. To be sure, plaintiffs valued their emotional injuries to be worth considerably more than the jury awarded. In their complaint, plaintiffs re-quested $300,000 apiece in compensatory damages. The verdict also fell far short of their request for $500,000 each in punitive damages. However, the damages were not insubstantial in light of the lack of hard numbers (i.e., medical costs, wages, etc.) presented.

Finally, the verdict obtained in this case is of some public significance. The jury awarded punitive damages against two prominent members of the Somerville police force, potentially putting the department and the community on notice of the need for thorough investigations of alleged police misconduct. To the extent that the award has a deterrent effect on other officers, it constitutes a measure of success for plaintiffs here. On the other hand, plaintiffs somewhat overstate the case's impact. Six of the individual defendants escaped liability altogether. The most compelling evidence involved the alleged beating of Henderson, not a plaintiff, whose severely bruised face was amply documented in a photograph. No credible explanation for these bruises was ever given by any of the individual defendants or the City. One police officer walked the "blue line" by testifying about the beating of Henderson but neither this police officer nor the other defendants (who vigorously denied using excessive force), were vindicated here because the verdict, of course, could address only the claims of plaintiffs. Additionally, the jury did not credit plaintiffs' race-based theory of liability. Accordingly, the mixed verdict and settlement reflect the frustrations of a trial process.

"A reduced fee award is appropriate if the relief, however significant, is limited in comparison to the scope of the litigation as a whole." *Hensley*, 461 U.S. at 440, 103 S.Ct. 1933. In sum, I find that reduction of the lodestar by fifteen percent is appropriate here in light of plaintiffs' loss on two heartland issues, the lack of success with respect to six defendants, and plaintiffs' failure to recover the relief requested from the key defendants. Any greater reduc-

tion would undermine the modest success achieved.

## III. *Costs*

■ "The attorneys' reasonable and necessary costs and expenses may be awarded to a prevailing party pursuant to 42 U.S.C. § 1988." *Culebras Enters. Corp.*, 846 F.2d at 103 (citing *Palmigiano v. Garrahy*, 707 F.2d 636, 637 (1st Cir. 1983)). "However, the reasonable costs that can be awarded ... are only those related to plaintiffs' successful claims." *Id.* Plaintiffs request $50,452.31 in costs (including $80 for expenses associated with this fee petition).[9]

For the most part, the costs submitted by Attorney Hernandez are within reasonable limits and bear a rational relation to the extent of this litigation. *See Guckenberger*, 8 F.Supp.2d at 111. The Court agrees with the City, however, that the following specific costs should be deducted or reduced:

■ (1) The Court eliminates a total of $72.60 in service of process costs for Lisa McLean and the District Attorney's office, as these costs were associated with plaintiffs' unsuccessful, severable malicious prosecution claim. The Court also deducts a total of $456.15 in service of process costs for Richard Souza, James Whalen, Essex Process Servers (Daniel McCarthy), Glynn Montgomery & Associates, Constable Frederick L. Mangone, and Constable Fixman because it is not readily apparent from the billing records what services they provided or how they contributed to plaintiffs' case.

■ (2) The Court also eliminates $433.50 in costs for the depositions of Lisa McLean and Thomas Macone, who were associated only with the malicious prosecution claim. As deposition costs for Mc-

Lean and Macone were lumped together with those for Michael Kennelly in one sum ($650.25), I simply took two-thirds of that sum to arrive at the above figure. I deduct $103.82 in costs for the third deposition of Joseph Spear, which related only to the malicious prosecution claim.

■ (3) The Court reduces by fifty percent the significant costs associated with the videotape depositions because, as previously indicated, the videotapes enhanced plaintiffs' presentation of their case to the jury but were excessively costly to produce. I deduct in its entirety every cost clearly associated with the videotape depositions of Doherty, Spear, or Henderson, as these tapes were not used at trial. In total, I deduct $8277.25 for videotape costs.

■ (4) The Court reduces by twenty-five percent the $17,405.28 in costs claimed for the services of private investigator David Prum. Much of Prum's time was devoted to Michael Henderson, a key witness for the plaintiffs on their emotional distress claim. However, it is unclear from Prum's invoice submitted with the petition how a number of the individuals he contacted or services he performed are related to the successful claims in this case. Therefore, I deduct $4351.32 from the costs associated with Prum.

■ I did not deduct costs for delivery service, travel (parking and mileage), faxes, or postage. The City argues that these and other like items should be absorbed as part of overhead in the attorney's reasonable hourly rate. However, identifiable, out-of-pocket costs such as these, which are normally billed separately to the client, "are not properly treated as overhead expenses for purposes of a fee award." *LeBlanc–Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir.1998) (citing numerous cases);

9. The City challenges this request on the ground that plaintiffs did not comply with the technical requirements for claiming costs under 28 U.S.C. § 1924, but I conclude that any violations are technical. *See Phetosomphone*, 984 F.2d at 9 (noting that the trial court has discretion to award costs as necessary "on their face" in the absence of "a technically adequate application for costs").

*see also, e.g., West Virginia Univ. Hosps., Inc. v. Casey,* 898 F.2d 357, 366 (3d Cir. 1990) (finding that telephone and photocopying charges are not part of overhead and are allowable under 42 U.S.C. § 1988); *International Woodworkers, Local 5-376 v. Champion Int'l Corp.,* 790 F.2d 1174, 1183 (5th Cir.1986) (Rubin, J., concurring and dissenting) (distinguishing general "office overhead and secretarial expense, normally paid by the attorney out of his fee," from travel costs, long-distance telephone bills, consultant fees, and the like, "normally bill[ed] separately to the client" and awarded under § 1988).

■ Finally, I also allow the $80 that plaintiffs requested for anticipated costs associated with this fee petition.

## IV. *Effect of the Rule 68 Offer of Judgment*

■ Defendants' offer of judgment pursuant to Fed.R.Civ.P. 68 does not affect the Court's award of fees or costs in this case.

The City argues that plaintiffs cannot recover *any* attorneys' fees or costs incurred after June 1, 1998, the date of defendants' Rule 68 offer of judgment. Under Rule 68, if a plaintiff rejects a defendant's settlement offer and "the judgment finally obtained by the [plaintiff] is not more favorable than the offer," then the plaintiff "must pay the costs incurred [by the defendant] after the making of the offer." Fed.R.Civ.P. 68; *see also Marek v. Chesny,* 473 U.S. 1, 9–10, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985) (holding that the term "costs" in Rule 68 includes attorneys' fees and that, therefore, prevailing civil rights plaintiffs "who reject an offer more favorable than what is thereafter recovered at trial will not recover attorney's fees for services performed after the offer is rejected"). The City invokes this cost-shifting provision with regard to defendants' June 1, 1998, offer to allow judgment against the City in the total amount of $35,000, which included costs and attorneys' fees accrued through that date.

Plaintiffs contend that the City cannot satisfy its burden of establishing that defendants' settlement offer was more favorable than the jury's award of $15,676, *see Gavoni v. Dobbs House, Inc.,* 164 F.3d 1071, 1075–76 (7th Cir.1999) (noting that the offeror bears the burden of showing that Rule 68's "mandatory cost-shifting provision [is] ... triggered"), because the offer was unapportioned between the two plaintiffs and therefore defective. As a result, plaintiffs could not have "evaluated the individualized values of the offer" and compared them to their own independent prospects for success before a jury. *Id.* at 1076 (holding that the defendant "failed to carry its burden" under Rule 68 because its settlement offer of $10,000 did not specify how much of the total amount it was allocating to each of the three plaintiffs).

According to the Seventh Circuit, "[r]equiring the offeror, always a defendant, to make an offer precise enough to enable each offeree, always a plaintiff, to assess the merits of her claim relative to the value of the offer is the better rule." *Id.* at 1078 n. 2; *see also id.* at 1076–77 (distinguishing *Marek* and other "lump sum" cases, which hold that Rule 68 does not require defendants to differentiate between amounts being offered for damages and for costs, on the ground that "an offer itemized by individual plaintiff" would advance each plaintiff's "predictive considerations"). In ruling this way, the court had in mind not only the significant monetary consequences that plaintiffs face in assessing settlement offers, but also the need for clarity of offers to aid district courts in comparing the values of offers and judgments. *See id.* at 1076.

■ Defendants' argument fails for a second reason: the amount ultimately awarded to the plaintiffs in this case was in fact more favorable than the amount of the offer. The proper comparison is between the amount of the settlement offer on the one hand, and the sum of the

damages award and the pre-offer costs and attorneys' fees on the other. *See Marek,* 473 U.S. at 7, 105 S.Ct. 3012. Here, the sum of the jury's award ($15,676) and the pre-offer costs and fees ($34,469.88) is $50,145.88, which exceeds the $35,000 offer. Because I conclude that the City has not shown that the settlement offer was more favorable than the ultimate award (even when reduced by fifteen percent), I do not need to address plaintiffs' other arguments under Rule 68.

### ORDER

The Court **ORDERS** the City of Somerville to pay plaintiffs the following as the assessment of attorneys' fees and costs that the Court, in its discretion, deems reasonable:

(1) attorneys' fees of $129,903.38; and

(2) $36,757.67 in costs.

### Appendix A

| Biller (amount requested) | Hours | | Rate | | Lodestar |
|---|---|---|---|---|---|
| ROBERT HERNANDEZ (883.4 × $250) | | | | | |
| Core | 424.6 | × | $250 | = | $106,150.00 |
| Non-Core | 201.0 | × | $165 | = | $ 33,165.00 |
| Clerical | 3.2 | × | $ 40 | = | $ 128.00 |
| CARMEN PANIAGUA & MARTIN FLAX (154.7 × $130) | | | | | |
| Core | 63.9 | × | $130 | = | $ 8,307.00 |
| Non-Core | 58.7 | × | $ 85 | = | $ 4,989.50 |
| Clerical | 2.2 | × | $ 40 | = | $ 88.00 |
| LODESTAR TOTAL | | | | | $152,827.50 |
| less 15% | | | | | $129,903.38 |