**Anita J. HORNEY, Plaintiff,**

v.

**WESTFIELD GAGE CO., et al., Defendants.**

**No. Civ.A. 99–30175–KPN.**

United States District Court, D. Massachusetts.

May 1, 2000.

Donna M. Cuipylo, W. Roxbury, MA, for Anita J. Horney, plaintiff.

Timothy J. Ryan, Crevier & Ryan, Springfield, MA, for Westfield Gage Co., Richardson Patterson and Edward Woodis, defendants.

MEMORANDUM AND ORDER RE-GARDING DEFENDANT ED-WARD WOODIS' MOTION TO DIS-MISS (Docket No. 09)

NEIMAN, United States Magistrate Judge.

Pursuant to FED.R.CIV.P. 12(b)(6), Edward Woodis ("Woodis") has moved to dismiss this sexual harassment and discrimination complaint insofar as it is brought against him individually as a supervisor of Anita Horney ("Plaintiff"). Neither Richard Patterson nor Westfield Gage Co., the other defendants, presents any motion for the court's consideration. Woodis' motion raises several issues, the most important of which is whether he may be held individually liable for Plaintiff's injuries pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. For the reasons which follow, the court will grant Woodis's motion, but only in part. The parties have consented to the jurisdiction of this court pursuant to 28 U.S.C. § 636(c) and FED.R.CIV.P. 73(b).

## I. STANDARD OF REVIEW

When confronted with a Rule 12(b)(6) motion to dismiss, a court must view the facts as presented in the pleadings, and all reasonable inferences to be drawn therefrom, in the light most favorable to the non-moving party. See Acadia Motors, Inc. v. Ford Motor Co., 44 F.3d 1050, 1055 (1st Cir.1995). A dismissal for failure to state a claim is appropriate only if it appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory. Rumford Pharmacy, Inc. v. City of East Providence, 970 F.2d 996, 998 (1st Cir.1992). The issue is not whether a plaintiff will ultimately prevail, but whether she is entitled to offer evidence to support her claims. See Vartanian v. Monsanto Co., 14 F.3d 697, 700 (1st Cir.1994); Day v. Fallon Community Health Plan, Inc., 917 F.Supp. 72, 75 (D.Mass.1996).

Ordinarily, if a court takes any documents into consideration other than those

which are attached to the complaint or expressly incorporated therein, a Rule 12(b)(6) motion to dismiss must be converted into one for summary judgment. FED.R.CIV.P. 12(b). Exceptions, however, are made "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to the plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir.1993). Here, Plaintiff has submitted documents, without opposition from Woodis, that meet most, if not all, of the above exceptions. Accordingly, the court has considered those documents without converting the motion into one for summary judgment.

## II. *FACTUAL BACKGROUND*

The following facts are assumed to be true for purposes of the instant motion. Plaintiff was employed by Westfield Gage Co. ("Westfield Gage") from April 14, 1994 until April 9, 1998. At all relevant times, Woodis was a Quality Control Manager at Westfield Gage, a supervisory position with respect to Plaintiff.

Plaintiff's employment history at Westfield Gage can be summarized briefly. During Plaintiff's four-year tenure, she received no negative job evaluations and faced no disciplinary actions. Her pay, in fact, was increased twice during 1995. In 1996, Plaintiff was promoted to a supervisory position. Then, during the summer of 1997, Plaintiff was promoted again, this time to the Inspections Department. Plaintiff was fired on April 9, 1998.

The complaint alleges several instances of unequal treatment regarding Plaintiff's employment at Westfield Gage. For example, Plaintiff claims to have received no mentoring in her Inspections Department job, unlike males starting in the same position. Plaintiff also asserts that neither her 1996 nor her 1997 promotion resulted in her being compensated at a level commensurate with similarly situated males. To be sure, Plaintiff requested—and ultimately received—a salary increase for her Inspections Department job directly from Louis Filios, the owner of Westfield Gage. Woodis, however, upon learning that Plaintiff went over his head, told Plaintiff that she would be terminated if she "ever did that again."

Plaintiff alleges other instances of harassing conduct during her employment. On February 7, 1997, Plaintiff filed a complaint of "unequal and harassing treatment" with the company's human resources department after a manager apparently used profanity in her presence. (Complaint ¶ 16.) Plaintiff thereafter made several additional complaints that Woodis had "used sexually offensive language when speaking with her[,] ... referred to her in a crude and sexually offensive manner[,] ... spoke of her mother in sexually derogatory terms ... [and] routinely spoke of a woman's 'place' and 'purpose' in an offensive and sexually derogatory manner." (*Id.* ¶ 17.)

Purportedly, Westfield Gage took no action in response to Plaintiff's complaints. Moreover, beginning in October 1997, Plaintiff's overtime hours were severely restricted while her male colleagues' hours were not. In addition, Plaintiff, unlike her male co-workers, was required to perform tasks outside her job responsibilities.

A final incident occurred on April 9, 1998, when, Plaintiff alleges, Woodis subjected her to further "abusive and hostile behavior." (*Id.* ¶ 22.) Plaintiff reported the incident to the human resources department and left work. Plaintiff was immediately called back to the Westfield Gage premises and summarily terminated. Although the complaint does not identify the exact reason why Plaintiff was fired—and the reason is not germane to this motion—Woodis avers in his answer to the complaint that Plaintiff was "mutually terminated" because "she didn't seem to be working out." Plaintiff, on the other hand, suggests that the termination was due to

her departure from work without her supervisor's permission.

### III. *PROCEDURAL BACKGROUND*

On April 16, 1998, Plaintiff, proceeding pro se, timely filed with the Massachusetts Commission Against Discrimination ("MCAD") a charge which named Westfield Gage as the respondent. The body of the charge alleged, inter alia, that both Woodis and Westfield Gage's General Manager, Richard Patterson ("Patterson"), had contributed to the discrimination Plaintiff suffered. It appears that an investigative conference was held on September 21, 1998.

Both Westfield Gage and Patterson, but not Woodis, were initially served with the charge. On January 8, 1999, however, Plaintiff, then represented by counsel, moved to amend the charge by specifically naming Woodis as a respondent. Woodis was served with the motion to amend on January 13, 1999, and, three months later, an attorney notified the MCAD by letter that he represented Woodis. The MCAD scheduled a conference on the motion to amend for May 11, 1999. Just prior to the hearing, however, Plaintiff requested, and was ultimately granted, permission to withdraw her MCAD charge and file suit in court. The MCAD charge was thereafter dismissed.

On August 10, 1999, Plaintiff filed this eight-count complaint. In it, Plaintiff alleges that Westfield Gage, Patterson and Woodis subjected her to sexual harassment and thereby violated Title VII (Count I) and the Massachusetts anti-discrimination statute, MASS.GEN.LAWS ch. 151B (Counts III and IV), and retaliated against her for opposing the harassment in violation of both Title VII and Chapter 151B (Count V). Plaintiff also alleges that Westfield Gage, by and through its agents, violated federal and state equal pay acts by better compensating males for comparable work (Counts VI and VII) and discriminated against her because of her gender in violation of Title VII (Count II).

Finally, Plaintiff's complaint asserts that all three defendants intentionally or negligently inflicted emotional distress upon her (Count VIII).

On October 8, 1999, Woodis moved to dismiss all claims directed at him as an individual. Plaintiff filed an opposition brief on October 22, 1999, and the court thereafter heard oral argument. After the hearing, the court requested the parties to submit supplemental briefs addressing the Supreme Court's recent decisions in *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), and *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). The court is now poised to resolve the motion.

### IV. *DISCUSSION*

There are three principal questions raised by Woodis' motion. First, may he, as a supervisor, be held individually liable pursuant to Title VII for Plaintiff's injuries? The answer to this question governs Counts I, II and V (insofar as it relates to Title VII) of the complaint. Second, is Woodis properly before the court on those claims Plaintiff pursues under Chapter 151B, i.e., Counts IV, V (insofar as it relates to Chapter 151B) and, perhaps, III (insofar as it may be directed at Woodis individually)? The issue underlying this second question is whether the MCAD charge sufficiently identified Woodis such that the instant action may be maintained. Third, is Plaintiff's common law claim against Woodis for emotional distress, set forth in Count VIII, preempted by either Chapter 151B or the Massachusetts Worker's Compensation Act, MASS.GEN.LAWS ch. 152? The court will address each question in turn.

### A. *Individual Supervisor Liability Pursuant To Title VII*

Woodis first argues that there is no individual supervisor liability under Title VII and, therefore, that the Title VII

claims against him as an individual, Counts I, II and V (insofar as it relates to Title VII), should be dismissed. Woodis maintains that the "majority"—as it turns out, every—circuit court which has addressed the issue has found that there is no individual liability under Title VII. *See Lissau v. Southern Food Service, Inc.,* 159 F.3d 177, 180–81 (4th Cir.1998); *Wathen v. Gen. Elec. Co.,* 115 F.3d 400, 405–06 (6th Cir. 1997); *Dici v. Commonwealth of Pennsylvania,* 91 F.3d 542, 551–52 (3d Cir.1996); *Haynes v. Williams,* 88 F.3d 898, 898–901 (10th Cir.1996); *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1313–17 (2d Cir.1995); *Gary v. Long,* 59 F.3d 1391, 1399 (D.C.Cir.1995); *Lenhardt v. Basic Institute of Technology, Inc.,* 55 F.3d 377, 380–81 (8th Cir.1995); *U.S. E.E.O.C. v. AIC Sec. Investigations, Ltd.,* 55 F.3d 1276, 1279–82 (7th Cir.1995); *Cross v. Alabama State Dep't of Mental Health & Mental Retardation,* 49 F.3d 1490, 1504 (11th Cir.1995); *Grant v. Lone Star Co.,* 21 F.3d 649, 653 (5th Cir.1994); *Miller v. Maxwell's Int'l, Inc.,* 991 F.2d 583, 587–88 (9th Cir.1993). He concedes, however, that, to date, the First Circuit has declined to rule on the question. *See Serapion v. Martinez,* 119 F.3d 982, 992–93 (1st Cir.1997); *Morrison v. Carleton Woolen Mills, Inc.,* 108 F.3d 429, 444 (1st Cir.1997).

Other courts within this circuit have addressed the issue of individual supervisory liability with varying results. *Compare, e.g., Wyss v. Gen. Dynamics Corp.,* 24 F.Supp.2d 202, 204 (D.R.I.1998) (holding that there is individual liability under Title VII), *and Ruffino v. State St. Bank and Trust Co.,* 908 F.Supp. 1019, 1047–48 (D.Mass.1995) (similar), *with Meara v. Bennett,* 27 F.Supp.2d 288, 290 (D.Mass.1998) (noting that Title VII bars individual liability), *and Chatman v. Gentle Dental Center of Waltham,* 973 F.Supp. 228, 239 (D.Mass.1997) (finding that an "employee/supervisor" cannot be held liable under Title VII). Although this court previously declined to address the issue, *see Ligenza v. Genesis Health Ventures of Mass., Inc.,* 995 F.Supp. 226, 233 (D.Mass. 1998), it today joins those courts which have concluded that there is no individual supervisor liability under Title VII.

### 1.

The interpretation of a statute must begin with its language and end there as well if the language "speaks with clarity to an issue." *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 475, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992). Title VII makes it unlawful for an "employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). The statute defines "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees ... and any agent of such a person." 42 U.S.C. § 2000e(b).

The controversy over individual liability centers around the meaning of the term "any agent." One interpretation concludes that, since an "employer" may be liable under Title VII, the inclusion of "any agent" in the definition of "employer" means that an "agent," including a supervisor, may also be individually liable. *See, e.g., Wyss,* 24 F.Supp.2d at 206. The opposite view, and the one favored by the overwhelming majority of courts, holds that the phrase "any agent" simply means that an employer is liable for the acts of those employees acting within the scope of their employment, but does not extend liability beyond the employer to the individual harasser. *See, e.g., Tomka,* 66 F.3d at 1316. This court believes that this latter interpretation makes the most sense, although, given the ambiguous statutory context in which the phrase "any agent" finds itself, the court will also look at Title VII's legislative history.

### 2.

There are a variety of legislatively-based reasons why Title VII must be read as

denying individual liability. First, Title VII requires that employers keep employment records and post notices summarizing Title VII provisions and filing requirements. *See* 42 U.S.C. §§ 2000e–8(c) and 2000e–10; *see also Chatman*, 973 F.Supp. at 238 (noting the "problematic results" that would follow "[i]f 'employer' were read consistently throughout the statute to include supervisors as agents"). A "plain language" reading holding supervisory individuals to these requirements might mean that employees—the group protected by Title VII—would also bear the full burden of compliance with these requirements. This, courts have found, stretches the language too far. *See Chatman*, 973 F.Supp. at 238; *Hernandez v. Wangen*, 938 F.Supp. 1052, 1064 (D.P.R.1996).

Second, numerous courts have found that the intent of Congress regarding the term "any agent" favors a finding of no individual liability. *See, e.g., Tomka*, 66 F.3d at 1314; *Grant*, 21 F.3d at 652–53; *Miller*, 991 F.2d at 587–88. For the most part, these courts suggest, and this court agrees, that the inclusion of the phrase "any agent" in the definition of "employer" is to incorporate the concept of respondeat superior into Title VII. *See, e.g., Miller*, 991 F.2d at 587. The Supreme Court, in fact, has indicated that this use of the term " 'agent' . . . evinces an intent to place some limits on the acts of employees for which *employers* under Title VII are to be held responsible." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (emphasis added). *See Faragher*, 524 U.S. at 804, 118 S.Ct. 2275 (reaffirming holding in *Meritor* "that an employer is not 'automatically' liable for harassment by a supervisor who creates the requisite degree of discrimination"). In other words, the inclusion of the term "agent" speaks to the extent of an employer's liability, not the liability of the individual.

Third, the provision in Title VII which exempts companies with fewer than fifteen employees from liability, *see* 42 U.S.C. § 2000e(b), also evinces a legislative intent to exempt individuals from such liability. Numerous courts have found it "inconceivable" for Congress to protect small employers from Title VII liability while contemporaneously allowing for liability against individual employees, regardless of the company's size. *See, e.g., Miller*, 991 F.2d at 587; *Meara*, 27 F.Supp.2d at 290. *But see Wyss*, 24 F.Supp.2d at 207 (noting that individual liability is based on fault whereas employer's liability derives from social or economic policy). This court agrees.

A fourth point regarding legislative intent has to do with Title VII's remedies. The original remedies available under Title VII were "reinstatement" and "back pay," the type of remedies naturally linked to an employer. *See Tomka*, 66 F.3d at 1314. An "agent," generally speaking, is not individually capable of reinstating a plaintiff. And, although "back pay" could theoretically be assessed against an individual, the use of that term connotes a remedy against an entity who had at one point provided "pay" to the plaintiff. *See id.* at 1314–15.

To be sure, the Civil Rights Act of 1991, by adding compensatory and punitive damages to the list of available remedies under Title VII, strengthened the argument that some remedies under Title VII might be assessed against individuals. However, the accompanying legislative history clearly indicates that those remedies were meant to provide an additional deterrent to "employers," not individuals. *See, e.g.,* H.Rep. No. 102–40(I), at 65 (1991), *reprinted in* 1991 U.S.C.C.A.N. 603 ("[m]onetary damages simply raise the cost of an employer's engaging in intentional discrimination, thereby providing employers with additional incentives to prevent intentional discrimination in the workplace before it happens"); *id.* at 69, *reprinted in* 1991 U.S.C.C.A.N. at 607 ("[m]aking employers liable for all losses—economic and otherwise—which are incurred as a consequence of prohibited discrimination . . . will serve

as a necessary deterrent to future acts of discrimination"). *See also Tomka,* 66 F.3d at 1315 (in passing the 1991 amendment, "it appears that Congress contemplated that only employer-entities could be held liable for compensatory and punitive damages, because if 'Congress had envisioned individual liability ... it would have included individuals in this litany of limitations and discontinued the exemption for small employers' ") (quoting *Miller,* 991 F.2d at 587–88 n. 2).

A fifth issue has to do with the damage "caps" imposed by the 1991 amendments. Under Title VII, as amended, damage awards are calibrated, and ultimately capped, depending on the size of the employer. There is, however, no mention of individual limits. Although one court has read the 1991 amendments as suggesting unlimited individual liability, *see Wyss,* 24 F.Supp.2d at 209, a more logical interpretation, in this court's view, is that Congress did not mention individual damage caps for the simple fact that only employer liability was contemplated under Title VII. *Miller,* 991 F.2d at 587–88 n. 2. At bottom, the legislative history, as most courts have found, favors the conclusion that there is no individual supervisor liability under Title VII.

### 3.

While the above discussion would appear to end the matter, the court finds it necessary, given the arguments proffered at oral argument, to address whether the recent Supreme Court sexual harassment decisions in *Faragher* and *Ellerth* shed any light on the issue of individual supervisor liability. In these decisions, the Supreme Court established an affirmative defense for an employer who shows that it acted "reasonably" in attempting to prevent and correct any harassment and that the plaintiff-employee acted "unreasonably" by failing to avoid harm. *See Faragher,* 524 U.S.

at 807, 118 S.Ct. 2275; *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257.

At first glance, both *Faragher* and *Ellerth* appear to create the possibility of a disturbing outcome in certain Title VII cases. Assuming no individual supervisor liability, a successful affirmative defense also would place the employer beyond Title VII's remedial reach. Further analysis, however, reveals that such a result would not be contrary to Title VII principles. As indicated, the affirmative defense spelled out in *Faragher* and *Ellerth* is available only to employers who have acted "reasonably" in guarding against sexual harassment in the workplace. Thus, the primary purpose of Title VII—"to avoid harm," *Faragher,* 524 U.S. at 805–06, 118 S.Ct. 2275—is served by absolving employers who take "reasonable" steps to avoid harm and whose employees, in turn, "unreasonably" decline to utilize "any preventive or corrective opportunities." *See Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275. As the Court noted in *Ellerth,* Title VII's "deterrent purpose" is served by a policy which encourages employees to report offensive conduct before it becomes severe. *See Ellerth,* at 764, 118 S.Ct. 2257. In so doing, workers enable their employers to sanction co-employees or supervisors who are found to have caused the offensive conduct. That avenue, not liability through suit, is apparently the method chosen by both Congress and the Supreme Court through which supervisors may be held responsible.

### 4.

In sum, Plaintiff has not convinced this court that it should deviate from the overwhelming majority of courts which have declined to find individual supervisory liability under Title VII. The Supreme Court's recent decisions in *Faragher* and *Ellerth* do not alter this conclusion.[1] Therefore, Woodis' motion to dismiss

1. The court notes that even a plaintiff without remedy under Title VII often will have re-   course, as here, to state discrimination laws.

Counts I, II, and V (insofar as it relates to Title VII) will be allowed.

## B. *Chapter 151B Claims*

Woodis next argues that Count IV, which alleges sexual harassment in violation of Chapter 151B, plus that portion of Count V which alleges Chapter 151B retaliation as well as Count III, insofar as it may be directed at Woodis individually, should be dismissed because Plaintiff's MCAD complaint failed to timely name him as a respondent. In support, Woodis relies principally on two intermediate Massachusetts decisions, *Powers v. H.B. Smith Co., Inc.*, 42 Mass.App.Ct. 657, 679 N.E.2d 252 (1997), *rev. denied*, 425 Mass. 1105, 682 N.E.2d 1362 (1997), and *King v. First*, 46 Mass.App.Ct. 372, 705 N.E.2d 1172 (1999), both of which denied recovery against defendants who were added to a complaint after the action was removed from the MCAD.

▮ The court believes that *Powers* and *King* are distinguishable. In *Powers*, a summary judgment case, the Massachusetts Appeals Court noted that "[t]he plaintiff could have moved to amend his MCAD complaint" to add the individual as a respondent, but, unlike here, "failed to do so." *Powers*, 679 N.E.2d at 259. In *King*, the Appeals Court indicated that, because the purpose of the MCAD filing requirement is to provide notice and an opportunity for a defendant to conciliate, an individual not even mentioned in the MCAD charge must be excused from liability. *See King*, at 1174. In the present case, however, Woodis was named in the body of the MCAD charge.[2] Moreover, Woodis knew of the allegations in the

MCAD charge from Plaintiff's motion to amend that charge, and, it reasonably may be inferred, had an opportunity to conciliate from the time he received such notice. Under these circumstances, the court concludes that the Chapter 151B counts against Woodis should survive.

This conclusion is well supported by case law from this district. In *Chatman*, for example, District Judge Reginald C. Lindsay held that a plaintiff could maintain an action against a party named in the MCAD charge, although not as a respondent, when "the charge put that party's conduct at issue and ... the party was on notice of the charge and had an opportunity to participate in the MCAD proceeding." *Id.*, 973 F.Supp. at 234. That conciliation may not have gone forward in the present matter does not alter the court's conclusion that it was available. *See Winters v. ADAP, Inc.*, 76 F.Supp.2d 89, 93–94 (D.Mass.1999) (denying summary judgment to defendant named in MCAD complaint but not as a respondent); *Chapin v. Univ. of Mass. at Lowell*, 977 F.Supp. 72, 76–78 (D.Mass.1997) (denying motion to dismiss where defendant, although not named in the MCAD charge, was sufficiently identified by title and had notice of the complaint as well as an opportunity to conciliate).[3]

For the foregoing reasons, the court believes that Plaintiff has sufficiently stated claims against Woodis under Chapter 151B. Accordingly, the motion to dismiss Counts IV, V (insofar as it relates to Chapter 151B) and III (insofar as it may be directed at Woodis individually) will be denied.

---

**2.** The court notes that the MCAD "complaint" form only asks the aggrieved person to list the "EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY OR STATE/LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME." Because it will be the rare party who lists an individual in response to this query, the court reads the "charge as a whole." *See Chatman*, 973 F.Supp. at 234.

**3.** Woodis' reliance on *Brunson v. Wall*, 405 Mass. 446, 541 N.E.2d 338 (1989), is also without merit. Here, unlike *Brunson*, there is no prior MCAD decision that would "preclude" this litigation. In fact, even the *Brunson* court recognized that certain individuals, although not named in the MCAD charge, had independent status in the court action because their "conduct was at issue" in the MCAD's proceedings. *See id.*, 541 N.E.2d at 341.

## C. *Emotional Distress*

As a final matter, Woodis asserts that Count VIII, claiming both intentional and negligent infliction of emotional distress, cannot be maintained against him as a separate cause of action. It is unclear from Plaintiff's opposition whether she has abandoned Count VIII insofar as it claims negligent infliction of emotional distress. The court will therefore address Count VIII as claiming both types of harm.

 Woodis mistakenly argues that the purported "exclusivity" of Chapter 151B prevents Plaintiff from recovering, under a separate count, for damages stemming from the intentional infliction of emotional distress. To be sure, in *Charland v. Muzi Motors, Inc.*, 417 Mass. 580, 631 N.E.2d 555 (1994), the Massachusetts Supreme Judicial Court stated that Chapter "151B provides the exclusive remedy for employment discrimination *not based on preexisting tort law or constitutional protections.*" *Id.*, 631 N.E.2d at 559, 631 N.E.2d 555 (emphasis added). However, in 1996, the Supreme Judicial Court noted that common law claims such as negligent and intentional infliction of emotional distress are not barred by the exclusivity provision of Chapter 151B. *See Green v. Wyman-Gordon Co.*, 422 Mass. 551, 664 N.E.2d 808, 813 (1996) (citing *Comey v. Hill*, 387 Mass. 11, 438 N.E.2d 811, 817 (1982)).

 Woodis also erroneously argues that the Workers Compensation Act precludes recovery against him for the negligent infliction of emotional distress. *See* MASS.GEN.LAWS ch. 152. When a negligence-related injury appears to be covered by the Workers Compensation Act, the injured employee still may recover in court unless the injury occurred "in the course of his employment by the negligence of a fellow employee ... [who] was acting in the course of his employment." *Mulford v. Mangano*, 418 Mass. 407, 636 N.E.2d 272, 274 (1994) (citations omitted). Similarly, an "intentional tort not related to the interests of the employer" is not preempt-ed by the Act. *See O'Connell v. Chasdi*, 400 Mass. 686, 511 N.E.2d 349, 351 (1987). Here, there is not yet enough information to determine whether both Woodis and Plaintiff were acting within the course of their employment when the torts allegedly occurred, or if anything they were doing was related to the interests of Westfield Gage. Accordingly, Count VIII in its entirety must survive this motion to dismiss.

## V. *CONCLUSION*

For the foregoing reasons, Woodis' motion to dismiss is ALLOWED as follows: Counts I, II and V are dismissed insofar as they allege that Woodis, in his individual capacity, violated Title VII. In all other respects, Woodis' motion to dismiss is DENIED. **The parties are hereby ordered to appear for a case management conference on May 18, 2000, at 11:30 a.m.**

IT IS SO ORDERED.