Anita J. HORNEY, Plaintiff

v.

**WESTFIELD GAGE COMPANY and Edward Woodis, Defendants**

**No. CIV.A. 99–30175–KPN.**

United States District Court, D. Massachusetts.

Oct. 17, 2002.

Donna M. Cuipylo, W. Roxbury, for Anita J. Horney, Plaintiff.

Thomas E. Shirley, Karen D. Lane, Choate, Hall & Stewart, Boston, MA, Timothy J. Ryan, Theodore F. Glockner, Crevier & Ryan, LLP, Springfield, MA, Mark E. Draper, Annino, Draper & Moore, P.C., Springfield, MA, for Defendants.

*MEMORANDUM AND ORDER WITH REGARD TO PLAINTIFF'S MOTION FOR ATTORNEY'S FEES AND COSTS (Docket No. 260)*

NEIMAN, United States Magistrate Judge.

Anita Horney ("Plaintiff")—having prevailed before a jury on various employment discrimination claims against Westfield Gage Company ("Westfield Gage") and Edward Woodis ("Woodis") (together "Defendants")—now moves for an award of attorney's fees in the amount of $269,020.50 and costs of $25,973.63. Defendants oppose Plaintiff's motion on various grounds and suggest that she be awarded only $78,967.18 and $14,851.07 respectively. For the reasons which follow, the court will award Plaintiff $136,585.00 in fees and $25,419.13 in costs.

## I. BACKGROUND

The background of the underlying matter has been extensively detailed in prior court decisions. *See Horney v. Westfield Gage Co.*, 211 F.Supp.2d 291, 296–301 (D.Mass.2002); *Horney v. Westfield Gage Co.*, 95 F.Supp.2d 29, 31–32 (D.Mass.2000). Therefore, the court describes only those facts salient to the present motion.

Plaintiff worked for Westfield Gage, a machine shop, from April of 1994 through April of 1998. At all times, she was supervised by Woodis. Shortly after leaving Westfield Gage's employ, Plaintiff filed a *pro se* charge of discrimination with the Massachusetts Commission Against Discrimination ("MCAD"), in which she claimed to have been a victim of on-the-job sexual harassment and gender discrimination. Soon thereafter, Attorney Donna Cuipylo ("Cuipylo") filed an appearance on Plaintiff's behalf. In due course, Plaintiff obtained permission to withdraw her MCAD charge in order to pursue a complaint in federal court.

On August 10, 1999, Plaintiff, proceeding *in forma pauperis*, filed the present action and targeted three defendants: Westfield Gage, its general manager Edward Patterson, and Woodis. As original-

ly framed, the action alleged that, during Plaintiff's employment at Westfield Gage, each defendant subjected her to sexual harassment and thereby violated Title VII of the Civil Rights Act of 1964 ("Title VII") and the Massachusetts anti-discrimination statute, Mass. Gen. Laws ch. 151B ("chapter 151B"), and retaliated against her for opposing the harassment in violation of both Title VII and chapter 151B. Plaintiff also alleged that Westfield Gage, by and through its agents, violated federal and state equal pay acts and discriminated against her because of her gender in violation of Title VII. Finally, Plaintiff's complaint asserted that each of the three defendants intentionally or negligently inflicted emotional distress upon her.

In May of 2000, the court dismissed Woodis and Patterson, as individuals, from Plaintiff's Title VII claims. *See Horney,* 95 F.Supp.2d at 32–36. (See also Docket No. 27.) Subsequently, in September of 2001, the court granted Westfield Gage summary judgment with respect to Plaintiff's claim of intentional infliction of emotional distress, dismissed Patterson entirely as a defendant and granted Woodis summary judgment with respect to Plaintiff's "constructive discharge" claim. (See Docket No. 150.)[1]

Trial on Plaintiff's remaining claims began on October 22, 2001. On October 29, 2001, at the close of Plaintiff's case, each defendant moved for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(a). The court generally denied these motions, although it did dismiss a "constructive discharge" claim aimed at Westfield Gage and a "retaliation" claim targeting Woodis. (See Docket Nos. 189, 190.) The court

also generally denied Defendants' renewed motions for judgment as a matter of law at the close of all the evidence, although it dismissed Plaintiff's claims for punitive damages. (See Docket Nos. 197 and 198.) Then, just prior to closing arguments, the court dismissed Plaintiff's state-based equal pay claim.

The jury began its deliberations on Friday, November 2, 2001. At that time six categories of claims remained: a Federal Equal Pay Act ("FEPA") claim targeting Westfield Gage; a claim against Westfield Gage for gender discrimination under Title VII; claims against Westfield Gage for sexual harassment under Title VII and chapter 151B; a retaliation claim also targeting Westfield Gage; a chapter 151B sexual harassment claim against Woodis; and a common law intentional infliction of emotional distress claim aimed at Woodis as well.

The jury returned a verdict late in the day on Monday, November 5, 2001. With regard to Plaintiff's FEPA claim, the jury found that Plaintiff had established her *prima facie* case, determined that Westfield Gage had not proven its affirmative defense and assessed damages in the amount of $8,140. As for Plaintiff's gender discrimination claim, the jury found that Westfield Gage had intentionally discriminated against her and awarded her $750,000 in damages for "economic harm," but assessed no damages for "emotional harm." With respect to the sexual harassment claims against Westfield Gage, the jury found that Plaintiff had established her *prima facie* case, determined that Westfield Gage had not proven the first

---

1. In the interim, in a memorandum and order dated June 7, 2001, the court awarded Plaintiff attorney's fees of $1,225 with respect to an "emergency" discovery motion Plaintiff had filed regarding Defendant's failure to produce certain statistical evidence. (Docket No.

119.) The award was based on a $125 hourly rate for Cuipylo. For the reasons then explained, the court concluded that the $175 rate sought by Cuipylo was too high, she then having just under five years experience. (See *id.* at 3–4.)

element of its affirmative defense and assessed damages for Plaintiff's emotional harm in the amount of $250,000. The jury also found that Woodis had sexually harassed Plaintiff and determined that he should pay $25,000 in damages for her emotional harm. Finally, the jury decided that Westfield Gage was not liable for retaliation and that Woodis was not liable for the intentional infliction of emotional distress. On November 27, 2001, the court, after calculating interest, entered judgment against Westfield Gage in the amount of $1,077,057.12 and against Woodis in the amount of $31,888.26.

Following the entry of judgment and in response to a number of post-trial motions, the court, in a memorandum and order dated June 20, 2002, allowed Plaintiff's motion to enforce a $25,000 post-trial settlement reached between her and Woodis, denied Woodis' motion to order Westfield Gage to pay that settlement and denied Woodis' other post-trial motion as moot. The court also denied Westfield Gage's post-trial motions in all but one respect; it determined that Westfield Gage would be granted a new trial on Plaintiff's gender discrimination claim unless Plaintiff agreed to remit to $187,500 the $750,000 jury award.

On July 5, 2002, Plaintiff agreed to the remittitur. Accordingly, on July 10, 2002, the court amended the total judgment against Westfield Gage to $533,663.52 (including interest). As to Woodis, the court, having allowed Plaintiff's motion to enforce the $25,000 settlement, dismissed with prejudice all remaining claims against him. Plaintiff then filed the instant motion for attorney's fees and costs.

In support of her motion, Plaintiff presents Cuipylo's time records from August 25, 1998, through July 10, 2002. Plaintiff multiplies the hours Cuipylo claims to have worked in that four-year period (1,281.05) by what Cuipylo asserts is her "current" hourly rate ($175), thereby producing a suggested "lodestar" figure of $224,183.75.[2] To this amount, Plaintiff applies a twenty percent "enhancement" ($44,836.75) for having achieved "exceptional success" over the course of what she describes as a "lengthy and risky" case. In total, Plaintiff seeks fees of $269,020.50 and $25,973.63 for such costs as investigation, service of process, experts and depositions.

## II. STANDARD OF REVIEW

A court's analysis of a fee request is not done in a vacuum. "In applying for judicial approval of a fee award, it is the plaintiff's burden to furnish the evidence required, not the court's burden to seek it out." *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 527 n. 11 (1st Cir. 1991). Likewise, a defendant's objection needs a certain level of particularity and specificity. *See Domegan v. Ponte*, 972 F.2d 401, 420 n. 35 (1st Cir.1992), *vacated on other grounds*, 507 U.S. 956, 113 S.Ct. 1378, 122 L.Ed.2d 754 (1993); *Brewster v. Dukakis*, 786 F.2d 16, 18–19 (1st Cir.1986).

To determine a proper fee award, a court must necessarily "engage in a thoughtful analysis of the number of hours expended and the hourly rates charged to ensure both are reasonable." *Guckenberger v. Boston Univ.*, 8 F.Supp.2d 91, 100 (D.Mass.1998). *See also King v. Greenblatt*, 560 F.2d 1024, 1026–27 (1st Cir. 1977). In doing so, the court is obliged "to

---

**2.** A lodestar is the product of the number of hours reasonably expended multiplied by reasonable hourly rates. As the First Circuit has explained, "[t]he lodestar method is the strongly preferred method by which district courts should determine what fees to award prevailing parties ...." *Coutin v. Young & Rubicam Puerto Rico, Inc.*, 124 F.3d 331, 337 (1st Cir.1997).

see whether counsel substantially exceeded the bounds of reasonable effort." *United States v. Metro. Dist. Comm'n*, 847 F.2d 12, 17 (1st Cir.1988) (citation and internal quotation marks omitted).

Typically, a court computes the lodestar "by ascertaining the time counsel actually spent on the case 'and then subtract[ing] from that figure hours which were duplicative, unproductive, excessive, or otherwise unnecessary.'" *Lipsett v. Blanco*, 975 F.2d 934, 937 (1st Cir.1992) (quoting *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 950 (1st Cir.1984)). Then, the court applies hourly rates to the various tasks, considering the prevailing community rates for comparable attorneys. *Id.* To say that a court must fashion a lodestar, however, "is not to say that the court is in thrall to an attorney's time records." *Coutin*, 124 F.3d at 337. A court, in its discretion, "can segregate time spent on certain unsuccessful claims, eliminate excessive or unproductive hours, and assign more realistic rates to time spent" and, ultimately, "may fashion a lodestar which differs substantially from the fee requested by the prevailing party." *Id.* (citations omitted).

## III. *DISCUSSION*

The parties agree that both Title VII and chapter 151B authorize a court to award reasonable attorney's fees and costs to a "prevailing party"—i.e., one who "succeed[s] on any significant issue in litigation which achieves some of the benefit [she] sought in bringing suit," *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)—and that Plaintiff is the prevailing party here. (See Docket No. 261 ("Plaintiff's Brief") at 1–2; Docket No. 263 ("Defendants' Brief") at 7, 18–19.) As the "prevailing party," Plaintiff claims entitlement to "full compensation" for her attorney's fees, including an enhancement, and all costs. In opposition, Defendants

propose that Plaintiff be awarded less than thirty percent of the fees sought and less than sixty percent of her costs. In calling for such drastic reductions, Defendants make five arguments: (1) Cuipylo's hourly rate is too high and, in any event, should be adjusted for non-core work and travel time; (2) Cuipylo spent excessive time on certain tasks; (3) the fees claimed impermissibly reflect numerous unsuccessful claims and fail to account for Patterson's dismissal and the court's remittitur; (4) no enhancement is called for; and (5) the cost request is excessive.

In the court's view, the final fee and cost figures Defendants propose are too stingy. Still, as indicated below, many of Defendants' arguments are well taken. Accordingly, the court structures its discussion around Defendants' five objections and, in the end, makes several targeted reductions.

## A. *WHETHER CUIPYLO'S CLAIMED HOURLY RATE OF $175 IS TOO HIGH*

Defendants' first argument has two parts: (1) that Cuipylo's "current" $175 rate is excessive and (2) that different rates should be applied to core work, non-core work and travel time. Both facets of this argument are adequately grounded in First Circuit precedent. *See Gay Officers Action League v. Commonwealth of Puerto Rico*, 247 F.3d 288, 296 (1st Cir.2001) ("the court may take guidance from, but is not bound by, an attorney's standard billing rate"); *Brewster v. Dukakis*, 3 F.3d 488, 492 n. 4 (1st Cir.1993) (upholding district court's discretion to distinguish between core work ("legal research, writing of legal documents, court appearances, negotiations with opposing counsel, monitoring, and implementation of court orders") and non-core work ("less demanding tasks,

including letter writing and telephone conversations")).

### 1. *Base Hourly Rate*

■ The court will apply a base hourly rate of $125 through June 7, 2001, the date of the court's order with respect to Plaintiff's "emergency" discovery motion. The court has already determined that, as of June 7, 2001, $125 per hour is an appropriate base rate for an attorney with Cuipylo's experience. See n. 1, *supra.*

The court, however, will apply a $150 base rate for hours Cuipylo expended after June 7, 2001. The reasons are several. First, an upward adjustment to Cuipylo's base rate is warranted by the mere fact that the litigation—which began in 1999 after about a year in the MCAD—has extended over a significant period of time. *Compare, e.g., Missouri v. Jenkins,* 491 U.S. 274, 283–84, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) (holding it appropriate to adjust rate upwardly "for delay in payment—whether by the application of current rather than historic hourly rates or otherwise"), *with Rolland v. Cellucci,* 106 F.Supp.2d 128, 142 (D.Mass.2000) (refusing to upwardly adjust rate where litigation took relatively short period of time). Second, by the time significant trial preparation was undertaken, Cuipylo had over six years of experience. Third, the increase is a relatively small adjustment in a case which was vigorously defended and which could well have involved multiple attorneys on Plaintiff's behalf. *See New York State Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1146 (2nd Cir.1983) (finding use of multiple attorneys appropriate in lengthy civil rights action); *Lipsett,* 975 F.2d at 939 ("Since a litigant's staffing needs often vary in direct proportion to the ferocity of her adversaries' handling of the case, this factor weighs heavily in the balance."). Finally, affida-

vits supplied by Plaintiff confirm the appropriateness of a hourly rate of $150 for an attorney with Cuipylo's increased level of experience during this later period. (Compare, e.g., Plaintiff's Brief, Affidavit of Hugh D. Heisler ¶¶ 2, 4 (describing his "customary" rate of $190 as a "trial attorney with an active litigation practice" and seventeen years of experience).)

### 2. *Differential Rates*

■ As indicated, the First Circuit allows, but does not require, courts to employ either a unified base rate for all legal activities or separate rates differentiating between core and non-core work. *See Brewster,* 3 F.3d at 492 n. 4; *Maceira v. Pagan,* 698 F.2d 38, 40–41 (1st Cir.1983) (citing cases). Here, for several reasons, the court will apply, rather uniformly, the base rate of $125 per hour through June 7, 2001 and $150 per hour thereafter. For one thing, the effort Cuipylo expended was fairly consistent over the course of this litigation. For another, to the extent that certain motion practice, discovery and other pre-trial activities may have been less demanding than trial efforts, the court has addressed those issues, at least in part, by choosing to apply relatively modest rates.

Still, the court will reduce Cuipylo's base rates by one-half with respect to time she spent performing "clerical activities," e.g., scheduling depositions, copying documents, filing letters, administering the case and conducting asset searches. *See McMillan v. Massachusetts Soc'y for Prevention of Cruelty to Animals,* 140 F.3d 288, 308 (1st Cir.1998) (trial court abused its discretion by not segregating tasks that "could have been adequately performed by a less experienced lawyer or by a secretary or paralegal"); *Lipsett,* 975 F.2d at 940 (holding that hours merely involving the translation of documents and court filings should be compensated at a "less extravagant" rate).

In doing so, the court is mindful that Cuipylo is a solo practitioner with little clerical help. However, it is well established "that clerical or secretarial tasks ought not to be billed at lawyers' rates, even if a lawyer performs them." *McMillan*, 140 F.3d at 308 (citation and internal quotation marks omitted). The court will also apply the one-half rate to Cuipylo's travel time. *See Maceira*, 698 F.2d at 40 (finding fifty percent rate for travel to be reasonable).

## B. *WHETHER CUIPYLO SPENT EXCESSIVE TIME ON CERTAIN TASKS*

■ Defendants contend that many of Cuipylo's hours are not reimbursable as they "were duplicative, unproductive, excessive, or otherwise unnecessary." *Lipsett*, 975 F.2d at 937. In this vein, Defendants also assert that Cuipylo's hours are often inadequately described. For example, Defendants take issue with her designation of 104 hours for "trial preparation" and 18.2 hours to "contact" for "interview" potential witnesses. They also target a number of hours designated "research."

Defendants' concerns with respect to the specificity of some of Cuipylo's entries are well taken. Nonetheless, the court is satisfied that Cuipylo's time records, when viewed as a whole and in the context of the entire litigation, "adequately limn the different tasks performed, the nature of the work, the time consumed, and the dates when effort was expended." *Id.* at 938. Still, the court has concluded that Cuipylo spent an excessive amount of time on certain tasks and inappropriately claims fees with respect to the June 7, 2001 discovery issue for which she has already been compensated.

This conclusion is not meant to criticize Cuipylo's efforts. The case presented several complex issues. Moreover, as Defendants are well aware, a key purpose in awarding fees in a case such as this is to encourage legal advocacy on behalf of those, like Plaintiff, unable to afford counsel. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 738, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) (Blackmun, J., dissenting) (citing legislative history). Even so, as the Supreme Court has explained, "[c]ounsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434, 103 S.Ct. 1933. Unfortunately, Cuipylo appears not to have exercised such billing judgment here. At bottom, the court concludes that three targeted reductions are warranted.

■ First, Cuipylo spent an inordinate number of hours researching and writing. For example, she lists 98.8 hours for "basic research" while Plaintiff's claim was pending before the MCAD, 84 hours (after June 7, 2001) to research and draft an opposition to Defendants' summary judgment motions, and 91 hours (after June 7, 2001) to research and draft an opposition to Defendants' post-trial motions. To be sure, Plaintiff was faced with a panoply of motions both here and at the MCAD. Nonetheless, the court views these hours as excessive and will pare them by thirty percent (not the fifty percent suggested by Defendants). *See Carey*, 711 F.2d at 1146 (district judge acted "within his discretion when he chose to make percentage reductions in response to defendants' detailed claims that the fee application contained excessive and duplicative hours").

Second, the court believes that a number of additional hours Cuipylo expended prior to June 7, 2001, are somewhat excessive and ought to be reduced as well. Accordingly, the court will reduce by twenty percent the following hours: 33.5 hours for researching and drafting oppositions to

Defendants' motions to dismiss, 21.3 hours for researching and drafting a supplemental memorandum on individual liability, and 18.8 hours in connection with a Rule 4.2 motion.

Third, the court will eliminate entirely from consideration the 13.3 hours Cuipylo expended, later reduced by the court to 9.8 hours, with respect to Plaintiff's "emergency" discovery motion. As described, Plaintiff was fully compensated for these efforts on June 7, 2001.

■ The court, however, declines to make two additional reductions requested by Defendants. First, Defendants assert that 18.5 hours spent by Cuipylo conferring with other attorneys or "mentor counsel" should be eliminated. Although the court eliminated one such hour when it awarded Plaintiff some fees on June 7, 2001, it will not reduce those hours any further. Cuipylo avers that she took this case from the Lawyer's Referral Service in August of 1998. Thus, it is understandable why she found it necessary to consult with seasoned counsel who, while not seeking fees, were likely more familiar with the legal issues presented. Moreover, the challenged consultations were appropriately distributed over the course of the entire four-year litigation and were reasonable in duration.

■ Second, citing *Alfonso v. Aufiero,* 66 F.Supp.2d 183, 193 (D.Mass.1999), Defendants seek to eliminate 9.5 hours Cuipylo "spent merely waiting for the jury's verdict" when she "could have been working on other matters." (Defendants' Brief at 10.) This is picayune. The challenged hours approximate only one business day, *compare Alfonso,* 66 F.Supp.2d at 193 (eliminating 62.6 hours waiting for jury verdict), during which time the jury posed a question to the court for which counsel needed to be available. As importantly, unlike either Defendants' trial counsel, whose offices are in Springfield, or the attorney in *Alfonso,* who was "free to leave ... or work on matters for other clients" while waiting for the verdict, *id.,* Cuipylo works in greater Boston. She did not have the luxury of leaving the courthouse to work on other matters.

## C. WHETHER ADJUSTMENT IS NEEDED TO ACCOUNT FOR PATTERSON'S DISMISSAL, OTHER "UNSUCCESSFUL" CLAIMS OR REMITTITUR

■ Defendants contend that, despite her assertions to the contrary, Plaintiff was not unqualifiedly successful and, thus, should not be fully compensated. In particular, Defendants maintain that (1) Patterson was dismissed from the case early on, (2) various claims against Westfield Gage and Woodis (including claims for punitive damages) were either thrown out by the court before or during trial or rejected by the jury, and (3) the court, via remittitur, dramatically reduced Plaintiff's frontpay damages. Accordingly, Defendants argue, the court should subtract the hours Cuipylo specifically devoted to Plaintiff's unsuccessful claims and thereby account for Plaintiff's "overall result ... in relation to the total number of attorney hours spent on the litigation." *Cunningham v. Williams Telecom. Sys., Inc.,* 928 F.Supp. 110, 114 (D.Mass.1996).

### 1. *Patterson*

Although Defendants calculate that Cuipylo spent 17.3 hours on Patterson alone and at least one-half of an additional 27.6 hours on both Patterson and Woodis, they suggest that Plaintiff's overall fee award should be reduced not by these cumulative hours but by at least ten percent to account for Patterson's dismissal. The court agrees, but only in a limited way.

In the court's view, it is nearly impossible to distinguish Cuipylo's efforts with respect to Patterson from her efforts against Woodis and Westfield Gage. Both Patterson and Westfield Gage, represented by the same attorney, proceeded in lockstep· and jointly filed a number of pleadings. (See, e.g., Docket Nos. 27, 35, 41 and 60.) Thus, Cuipylo's efforts would not have been much less had Patterson never been sued. Accordingly, the court will not reduce her hours simply because Patterson was dismissed from the case. Still, as described below, the court believes that some reduction is warranted to account overall for Plaintiff's unsuccessful claims which, per force, include her claims against Patterson.

### 2. *Unsuccessful Claims*

Defendants assert that the fee award should be reduced by at least fifteen percent to account for Plaintiff's lack of success on certain causes of action. Although the court believes that fifteen percent is too much of a reduction, it will, for the following reasons, reduce Plaintiff's lodestar by ten percent to account for her lack of success on a number of claims.

As the parties no doubt agree, a court may adjust a lodestar in light of the "results obtained." *Coutin,* 124 F.3d at 338. Indeed, for that very reason, Plaintiff actually argues for an *enhancement* of the lodestar. See discussion *infra.* In counterpoint, Defendants argue that the lodestar should be reduced because several claims against them were dismissed or otherwise unsuccessful. If the court is unable to identify the specific hours that should be eliminated, Defendants continue, " 'it may simply reduce the award to account for the limited success.' " *Andrade v. Jamestown Housing Auth.,* 82 F.3d 1179, 1191 (1st Cir.1996) (quoting *Hensley,* 461

U.S. at 436, 103 S.Ct. 1933). *See also Marrero v. Goya of Puerto Rico, Inc.,* 304 F.3d 7, 30 (1st Cir.2002).

In the court's opinion, Defendants have the better argument. There should be some reduction to the lodestar because Plaintiff did not succeed on a number of her claims. Accordingly, as directed by *Coutin,* the court has measured the "results obtained" by considering three factors: (1) "[P]laintiff's success claim by claim," (2) "the relief actually achieved," and (3) and "the societal importance of the right which has been vindicated." *Id.,* 124 F.3d at 338. In doing so, the court has been mindful "that attempts to allocate hours between claims may be unwarranted where an action involves related legal theories applied to a common core of facts." *Phetosomphone v. Allison Reed Group, Inc.,* 984 F.2d 4, 7 (1st Cir.1993) (citing *Hensley,* 461 U.S. at 434–35, 103 S.Ct. 1933).

As for the first factor, it is undisputed that Plaintiff was successful on many of her claims against both Westfield Gage and Woodis. As described, the jury returned FEPA, gender discrimination and sexual harassment verdicts against Westfield Gage as well as a verdict against Woodis for sexual harassment. To be sure, the court itself dismissed constructive discharge, punitive damages and state equal pay act claims against Westfield Gage, as well as a retaliation claim against Woodis and all claims targeting Patterson. Moreover, of the six claims that went to the jury, two resulted in defense verdicts: the retaliation claim targeting Westfield Gage and the emotional distress claim aimed at Woodis. Still, but for Plaintiff's punitive damages claims, the court finds it difficult to compartmentalize the efforts Cuipylo expended with respect to each of

Plaintiff's unsuccessful claims.[3] Fortunately or unfortunately, given the record presented, it need not try. *See Lipsett,* 975 F.2d at 940–41 (holding that court need not attempt to allocate unsuccessful claims hour-by-hour "where it would be an exercise in futility") (citation and internal quotation marks omitted). It can, in the alternative, apply a percentage reduction to the lodestar.

As for the second factor—the relief actually achieved—the damages awarded Plaintiff were substantial, particularly against Westfield Gage. Even after taking into account the unsuccessful claims and the court's remittitur, Plaintiff's award with respect to Westfield Gage, after interest, was over $500,000. As the Supreme Court has directed, "[w]here a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have [her] attorney's fee reduced simply because the district court did not adopt each contention raised." *Hensley,* 461 U.S. at 440, 103 S.Ct. 1933. *See also Coutin,* 124 F.3d at 339 ("a plaintiff who has limited success from a claim-by-claim standpoint, but who nevertheless obtains substantial compensation or other important relief, usually will fare much better in the fee wars, even though some of her claims failed").

Plaintiff was also successful against Woodis; the jury awarded her $25,000 for his sexual harassment. However, the analysis of the second factor with respect to Woodis is complicated by the court-enforced $25,000 post-trial settlement (which Woodis sought unsuccessfully to have Westfield Gage fund). *See Horney,* 211 F.Supp.2d at 301–08. Unfortunately, neither Plaintiff nor Westfield Gage, nor Woodis for that matter, has addressed the settlement issue in the context of the instant motion. Thus, no party has attempted to distinguish between Woodis and Westfield Gage for purposes of allocating fees.

This silence, particularly on Defendants' part, is curious. In addition to saving Woodis nearly $7,000 in interest, the settlement effectively waived his obligation to pay Plaintiff's attorney's fees and costs. *See Horney,* 211 F.Supp.2d at 302, 306–07. Given the court's enforcement of the settlement, it would appear that at least some fees otherwise fairly allocable to Woodis ought not be awarded. For purposes here, however, as well as on appeal, Woodis and Westfield Gage have evidently chosen to align their interests. Now. represented by the same counsel, they make no attempt to limit the attorney's fees allocable to Woodis. To be sure, it may well have been difficult to allocate the fees in that manner; for reasons previously described, the law and facts were inextricably intertwined as to both claims and parties. In the end, however, Defendants do not attempt to make the allocation and the court will not expend any effort on its own.

Finally, with respect to the third factor—the societal importance of the rights vindicated—the First Circuit has indicated that fees should be awarded consistent "with the recognized principle that even

---

3. For example, the evidence which needed to be adduced for purposes of the two equal pay claims was the same. Similarly, the fact that the jury found for Woodis on the emotional distress claim did not, even with hindsight, lessen the effort Plaintiff needed to expend in demonstrating her emotional damages. Likewise, the court's dismissal of the retaliation claim against Woodis and the jury's finding in Westfield Gage's favor on that same claim did not obviate the need for Plaintiff to present facts common to the related sexual harassment claims which did survive. The same holds true for Plaintiff's constructive discharge claim, which the court dismissed as an independent claim but incorporated into jury instructions with regard to the gender discrimination claim against Westfield Gage.

small damage awards," let alone the significant damages awarded here, "may mean a substantial victory for 'a policy that Congress considered of the highest importance.'" *Lewis v. Kendrick*, 944 F.2d 949, 955 (1st Cir.1991) (quoting *City of Riverside v. Rivera*, 477 U.S. 561, 575, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986)). *See also O'Connor v. Huard*, 117 F.3d 12, 18 (1st Cir.1997). Here, the damage award can hardly be characterized as small. Moreover, the verdict was a victory for an important policy, the vindication of a machine shop worker discriminated against by a large local employer and harassed by one of its supervisors. There can be no doubt that Congress' intent to thwart gender discrimination, sexual harassment and unequal pay has been served.

In sum, weighing all three factors, the court believes that a reduction in the lodestar is appropriate to account for Plaintiff's "unsuccessful" claims. Although the public's overall interest has been served and the relief awarded is significant, several important findings in favor of Defendants and Patterson justify a downward adjustment. That reduction, in the court's view, is ten percent. *See Alfonso*, 66 F.Supp.2d at 200–01 (reducing lodestar in civil rights action cited by Defendants by fifteen percent to account for lack of success on two "heartland issues," six individual defendants and some relief requested); *Clifton v. Mass. Bay Transp. Auth.*, 11 Mass. L. Rptr. 316, 327, 2000 WL 218397 (Mass. Super Ct.2000) (reducing attorney's fees earned in conjunction with substantial discrimination verdict by ten percent in action cited by Defendants to reflect that individual defendant settled prior to trial).

### 3. *Remittitur*

The court will not further reduce the lodestar to account for the gender discrimination remittitur, as Defendants request. The final award on that claim is still significant. There is no reason why Plaintiff would have spent any less time pursuing her gender discrimination claim had she known that her maximum recovery on that count would be reduced to $187,500.

### D. *WHETHER AN ENHANCEMENT IS WARRANTED*

The court effectively addressed Plaintiff's twenty percent enhancement claim in the previous section. Suffice it to say that the court's ten percent reduction is as modest as it is because of Plaintiff's counterbalancing success on most of her claims. In any case, the First Circuit has "repeatedly cautioned that ... enhancements will be rare." *Lipsett*, 975 F.2d at 942 (1st Cir.1992) (citing cases). The only exception, i.e., when the lodestar may not represent a reasonable fee, "is a tiny one—and we will not permit it to eclipse the rule." *Id.* Moreover, none of the judicial decisions Plaintiff cites justifies the twenty percent enhancement she seeks. *See Fontaine v. Ebtec Corp.*, 415 Mass. 309, 613 N.E.2d 881, 892 (1983) (finding enhancement unwarranted in discrimination case that "raised no novel issues of law" and "had significance for the plaintiff, but not for a wider class of persons"); *Freeman v. Package Mach. Co.*, 865 F.2d 1331, 1350 (1st Cir.1988) (no discussion of enhancement).[4]

4. Granted, it appears that in an MCAD decision Plaintiff cites, *Brown v. City of Salem Police Dep't*, 14 Mass. Discrim. L. Rptr. 1365 (1992), an administrative hearing officer enhanced counsel fees by twenty-five percent. Unfortunately, Plaintiff has not supplied a copy of *Brown* and the court has been unable to locate the decision on its own. More importantly, however, even Plaintiff's own description of *Brown* states that it, unlike here, "had exceptional public interest implications." (Plaintiff's Brief at 6.)

## E. *FEE SUMMARY*

The court's attorney fees calculations can be summarized as follows:

AUGUST 25, 1998 THROUGH JUNE 7, 2001

TOTAL HOURS CLAIMED:      665.66

| Reductions | Claimed | Reduced | Result |
|---|---|---|---|
| Section III(B) | | | |
| Basic Research | 98.8— 30% | ( 29.64) | |
| Research/Draft Dismiss Opp'n | 33.5— 20% | ( 6.70) | |
| Research/Draft Suppl. Mem. | 21.3— 20% | ( 4.26) | |
| Rule 4.2 Motion | 18.8— 20% | ( 3.76) | |
| "Emergency" Motion | 13.3—100% | ( 13.30) | |
| Travel (compensated at lower rate below) | | ( 39.00) | |
| Estimated Clerical (compensated at lower rate below) | | ( 49.00) [5] | |
| Subtotal | | 520.00 | |
| Section III(C) | − 10% | ( 52.00) | |
| Subotal | | 468.00 | |
| Total | | x $125.00 (rate) = | $ 58,500 |
| Travel | | 39.00 | |
| Clerical | | 49.00 | |
| Subtotal | | 88.00 | |
| Total | | x $ 62.50 (rate) = | $ 5,500 |
| Grand Total (August 25, 1998—June 7, 2001) | | | $ 64,000 |

JUNE 8, 2001 THROUGH JULY 10, 2002

TOTAL HOURS CLAIMED:      615.50

| Reductions | Claimed | Reduced | Result |
|---|---|---|---|
| Section III(B) | | | |
| Research/Draft Summ. J. Opp'n | 84.0—30% | (25.20) | |
| Research/Draft Post-trial Opp'n | 91.0—30% | (27.30) | |
| Travel (compensated at lower rate below) | | (17.00) | |
| Estimated Clerical (compensated at lower rate below) | | (40.00) [6] | |
| Subtotal | | 506.00 | |
| Section III(C) | − 10% | (50.60) | |
| Subotal | | 455.40 | |
| | | x $150.00 (rate) = | $ 68,310 |
| Travel | | 17.00 | |
| Clerical | | 40.00 | |

**5.** Using the definition of "clerical activities" set forth at p. 215, *supra,* the court finds twenty-four hours expended prior to June 7, 2001. To this amount, the court adds twenty-five hours for what it fairly assumes were clerical components of other tasks. *See Missouri v. Jenkins,* 491 U.S. 274, 288 n. 10, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) (noting that dollar value of paralegal, secretarial or clerical work "is not enhanced just because a lawyer does it") (citation and internal quotation marks omitted).

**6.** To a total of ten hours specifically identified as "clerical activities" after June 7, 2001, see p. 215, *supra,* the court has added thirty hours which it fairly assumes was the clerical component of other more substantive tasks.

| | | |
|---|---|---|
| Subtotal | 57.00 | |
| Total | x  $ 75.00  (rate) = | $    4,275 |

Grand Total (June 8, 2001—July 10, 2002)                     $   72,585

Total Overall Attorney's Fees                               $  136,585

## F.  *WHETHER PLAINTIFF'S COSTS ARE TOO HIGH*

▉ Finally, Defendants assert that Plaintiff's request for $25,973.63 in costs and expenses is excessive and suggest that only $14,851.07 be awarded. In particular, Defendants assert that $554.50 in "litigation consultation fees" and $4,470.89 in investigation fees should be eliminated because of Plaintiff's failure to provide details as to how such costs relate to the case. In addition, Defendants assert that $7,144.08 for Dr. McCausland's expert witness fee should be reduced by $5,358.06 (to $1,786.02) to reflect Plaintiff's limited success in obtaining front pay damages. Further, Defendants again argue that Cuipylo's "research" hours were excessive and that, as a result, her "on-line" research costs of $1,478.22 should be cut in half (to $739.11).

The court will eliminate the $554.50 attributable to litigation consultation fees as such fees are unsupported in the record. In contrast, the investigation fees and online research costs were not only reasonably supported both by docket entries (see, e.g., Docket Nos. 47, 50 and 59) and Cuipylo's time records, but were necessary on their face. Finally, the court finds Dr. McCausland's fee to have been entirely appropriate. The fact that the court dramatically reduced the front pay damages does not lessen Dr. McCausland's expert assistance to Plaintiff in achieving the significant front pay damages she ultimately accepted. Accordingly, the court will approve $25,414.13 in costs ($25,973.63 minus $554.50).

## IV.  *CONCLUSION*

For the foregoing reasons, Plaintiff is entitled to attorney's fees in the amount of $136,585.00 and costs of $25,414.13. These fees and costs shall be paid forthwith.

IT IS SO ORDERED.